FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**March 6, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

NORTHERN ARAPAHO TRIBE,

    Plaintiff - Appellant,

v.

XAVIER BECERRA, in his official
capacity as Acting Secretary, U.S.
Department of Health and Human Services;
ELIZABETH FOWLER, in her official
capacity as Acting Director, Indian Health
Service; UNITED STATES OF
AMERICA,

    Defendants - Appellees.

------------------------------

NATIVE AMERICAN TRIBES; TRIBAL
ORGANIZATIONS; INDIAN HEALTH
BOARDS; THE NATIONAL CONGRESS
OF AMERICAN INDIANS,

    Amici Curiae.

No. 21-8046

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 0:21-CV-00037-NDF)**

_____

Geoffrey D. Strommer of Hobbs, Straus, Dean & Walker, LLP, Portland, Oregon
(Stephen D. Osborne and Caroline P. Mayhew of Hobbs, Straus, Dean & Walker, LLP,
Portland, Oregon; Lucas Buckley of Hathaway & Kunz, LLP, Cheyenne, Wyoming, with
him on the briefs), for Plaintiff - Appellant.

John S. Koppel, Attorney, Appellate Staff, Civil Division, Department of Justice, Washington, D.C. (Brian M. Boynton, Acting Assistant Attorney General, L. Robert Murray, Acting United States Attorney, and Daniel Tenny, Attorney, Civil Division, Department of Justice, Washington, D.C., with him on the brief), for Defendants - Appellees.

_____

Before **MORITZ**, **BALDOCK**, and **EID**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

The Northern Arapaho Tribe and the Indian Health Service (IHS) entered into a contract under the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 5301–5423 (Self-Determination Act), for the Tribe to operate a federal healthcare program. Under the contract, the Tribe provides healthcare services to Indians and other eligible beneficiaries. In exchange, the Tribe is entitled to receive reimbursements from IHS for certain categories of expenditures, including "contract support costs." 25 U.S.C. § 5325(a)(2), (a)(3)(A).

The contract anticipates that the Tribe will bill third-party insurers such as Medicare, Medicaid, and private insurers. In return, the Tribe obtains payments that become program income, which the Tribe is statutorily required to inject back into the healthcare program "to further the general purposes" of its contract with the government. § 5325(m)(1). The Tribe contends that overhead costs associated with setting up and administering this third-party billing infrastructure, as well as the administrative costs associated with recirculating the third-party revenue it receives, qualify as reimbursable contract support costs under the Self-Determination Act and the Tribe's agreement with

2

IHS. But when the Tribe attempted to collect those reimbursements, IHS disagreed and refused to pay. Contending it had been shortchanged, the Tribe sued the government. The district court, agreeing with the government's reading of the Self-Determination Act and the contract, granted the government's motion to dismiss.

The Tribe appeals, and two members of the panel vote to reverse, albeit for different reasons.[1] I do so because, in my view, the relevant statutory provisions are ambiguous, and the Indian canon of statutory construction resolves the ambiguity in the Tribe's favor. That is, because the Tribe presents a reasonable interpretation of the ambiguous statutes, the canon dictates that the statutes "must be construed that way." *Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1062 (10th Cir. 2011) (quoting *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1462 (10th Cir. 1997)), *aff'd*, 567 U.S. 182 (2012). Judge Eid would instead reverse because the relevant statutes unambiguously support the Tribe's interpretation, making it unnecessary to resort to the Indian canon of construction. Under either of our interpretations, however, the administrative expenditures associated with collecting and expending revenue obtained from third-party insurers qualify as reimbursable contract support costs. Accordingly, we reverse and remand to the district court for further proceedings.

## Background

In 1975, President Gerald Ford signed the Self-Determination Act into law "to achieve 'maximum Indian participation in the direction of educational as well as

---

[1] Judge Baldock dissents; though he agrees with portions of Judge Eid's separate opinion, he would nevertheless affirm.

other [f]ederal services to Indian communities so as to render such services more responsive to the needs and desires of those communities.'" *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 185–86 (2012) (quoting 25 U.S.C. § 5302(a)). To that end, the statute directs the secretary of the relevant federal program—in this case, the Secretary of the Department of Health and Human Services—upon any tribe's request, "to enter into a self-determination contract . . . with a tribal organization to plan, conduct, and administer" health, education, economic, and social programs that the relevant secretary would otherwise have administered. 25 U.S.C. § 5321(a). In essence, these self-determination contracts "transfer responsibility for various programs from federal agencies to the tribes themselves, while maintaining federal funding of the programs." *Ramah Navajo Chapter*, 644 F.3d at 1058. In enacting the legislation, Congress declared its "commit[ment] to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities." § 5302(b).

In this case, the Tribe has contracted with IHS under Title I of the Self-Determination Act since 2016 to operate a federal health program that IHS otherwise would have operated. The contract comprises three documents—the contract itself, an annual funding agreement, and a document outlining the Tribe's scope of work—and provides that both it and the Self-Determination Act must be liberally construed in favor of the Tribe.

Under the contract, the Tribe provides healthcare services to eligible

4

beneficiaries. In return, IHS must provide the Tribe two types of funding under the Self-Determination Act: (1) "program" funds, meaning the amount the Secretary would have provided had IHS retained responsibility for the healthcare program,[2] § 5325(a)(1); and (2) "contract support costs," meaning the reasonable administrative and overhead costs associated with carrying out the healthcare program, § 5325(a)(2)–(3). This appeal concerns the scope of contract support costs, the latter category of funding.

The Tribe, believing that certain administrative expenses qualified as reimbursable contract support costs under the statute, requested reimbursement from IHS for fiscal years 2016 and 2017. IHS disagreed and did not pay. Accordingly, the Tribe timely sued to recover those unpaid costs under the Contract Disputes Act, 41 U.S.C. § 7104(b)(3). *See also* 25 U.S.C. § 5331(a).

In its complaint, the Tribe alleges that, by statute and under the contract, it is required to collect third-party revenue by billing third-party insurers, including Medicare, Medicaid, and private insurers. And after the Tribe receives the revenue from third parties, it expends some of that revenue to "provide services within the scope" of the agreement. App. 15; *see also* § 5325(m)(1). But "[e]arning, collecting, and expending" this revenue "on additional health[]care services create[s] additional overhead costs" that the Tribe contends qualify as reimbursable contract support costs. Aplt. Br. 20. Accordingly, the Tribe seeks to recover unpaid contract support

---

[2] This is sometimes called the "[s]ecretarial [a]mount." App. 10; *see also* *Salazar*, 567 U.S. at 186.

costs of $538,936 for 2016 and $1,001,201 for 2017 (plus interest on those amounts). The Tribe also sought a declaratory judgment that IHS's obligation to pay contract support costs includes reimbursement for "third-party revenues expended on health[]care services within the scope of the" contract and the incorporated annual funding agreement. App. 21.

The government moved to dismiss the Tribe's complaint. Broadly, the government argued that neither the Self-Determination Act nor the contract requires or even authorizes IHS to reimburse contract support costs related to third-party program income. Looking to the text of the Self-Determination Act's relevant provisions, the district court agreed, concluding that the statute unambiguously favored the government's interpretation. It therefore dismissed the Tribe's complaint. The Tribe appeals.

## Analysis

We review a dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim de novo. *Vote Solar v. City of Farmington*, 2 F.4th 1285, 1289 (10th Cir. 2021). In reviewing "such a motion, [we] must take as true '[a]ll well-pleaded facts, as distinguished from conclusory allegations,' view all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings." *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021) (second alteration in original) (quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002)). We also review questions of statutory and contract interpretation de novo. *See Bancamerica Com. Corp. v. Mosher Steel of Kan., Inc.*, 100 F.3d 792, 796 n.4 (10th

Cir.), *amended by* 103 F.3d 80 (10th Cir. 1996).

Generally, when reviewing a dismissal under Rule 12(b)(6), we consider "only the contents of the complaint." *Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.*, 21 F.4th 704, 709 (10th Cir. 2021) (quoting *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013)), *cert. denied*, 142 S. Ct. 2779 (2022). But here, we may also consider the documents referenced in the complaint—the contract, the annual funding agreement, and the scope-of-work document—because they are "central to the [Tribe's] complaint" and the parties do not dispute the documents' authenticity. *Id.* (quoting *Berneike*, 708 F.3d at 1146).

## I.    Threshold Matters of Statutory Interpretation

The parties agree that the task of construing the Self-Determination Act must "begin with its plain text." *Ramah Navajo Chapter*, 644 F.3d at 1062. "If the terms of the statute are clear and unambiguous, they are controlling absent rare and exceptional circumstances." *Id.* (quoting *Chickasaw Nation v. United States*, 208 F.3d 871, 876 (10th Cir. 2000)). In addition, "the broader context of the statute as a whole" may clarify "the meaning of a particular provision." *Id.* (quoting *Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1381 (10th Cir. 2009)).

Ordinarily, these bedrock principles of statutory interpretation are uncontroversial. Not so here. As the Tribe points out, these principles function differently in cases involving Indian tribes. *See Ramah Navajo Chapter*, 644 F.3d at 1062. In such cases, federal statutes "are to be construed liberally in favor of [tribes], with ambiguous provisions interpreted" in their favor. *Lujan*, 112 F.3d at 1461. This

7

principle of liberal construction is "rooted in the unique trust relationship between the United States" and Indian tribes. *Id.* (quoting *Oneida Cnty. v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985)). Thus, under this canon, if a statute "can reasonably be construed as the Tribe would have it construed, it must be construed that way."[3] *Id.* at 1462 (quoting *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1445 (D.C. Cir. 1988)).

Yet the parties dispute precisely when this canon of construction is triggered. The Tribe maintains that the canon applies from the outset of the interpretive inquiry and not only when a statute is ambiguous, whereas the government maintains that the canon kicks in "[o]nly if the terms of a statute are ambiguous." Aplee. Br. 17. On this point, I agree with the government that the canon applies only if the statute is ambiguous in the first place.[4] As a logical matter, that must be so: If the text of a statute is unambiguous, there cannot be competing reasonable interpretations. *See Maralex Res., Inc. v. Barnhardt*, 913 F.3d 1189, 1201 (10th Cir. 2019) ("A statute is 'ambiguous if it is reasonably susceptible to more than one interpretation or capable of being understood in two or more possible senses or ways.'" (quoting *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1226 (10th Cir. 2014))). Tenth Circuit precedent is in accord. *Ramah Navajo Chapter*, 644 F.3d at 1062 (explaining that courts "'look to traditional canons of statutory

---

[3] This canon applies equally to the interpretation of contracts. *See Ramah Navajo Chapter*, 644 F.3d at 1057.

[4] Because Judge Eid would find the statute unambiguous in favor of the Tribe, she does not reach this interpretive issue.

construction,'" including the canon of construction favoring Indian tribes, "if [the] statute is ambiguous" (quoting *Conrad*, 585 F.3d at 1381)).

But one aspect of the Tribe's argument, which the government does not dispute, is well-founded: Once a statute is determined to be ambiguous, the rule of liberal construction is more than an "ambiguity tiebreaker." Rep. Br. 9. Instead, when faced with ambiguity, the Tribe need not advance the best interpretation of the statute at issue, only a reasonable one. *See Ramah Navajo Chapter*, 644 F.3d at 1057; *Lujan*, 112 F.3d at 1462 (observing that "the canon of construction favoring [tribes] necessarily 'constrain[s] the possible number of reasonable ways to read an ambiguity in [the] statute'" (alterations in original) (quoting *Massachusetts v. U.S. Dep't. of Transp.*, 93 F.3d 890, 893 (D.C. Cir. 1996))).

In sum, I would conclude that the longstanding canon of construction favoring tribes is triggered only when there is ambiguity in the first place. And once a statute is found to be ambiguous, the Tribe need only present a reasonable interpretation to prevail. *See Ramah Navajo Chapter*, 644 F.3d at 1057. Or, framing the question from the opposite perspective, to avoid the application of the canon and resort to a tribe's reasonable interpretation, the government must "demonstrate that its reading is clearly required by the statutory language." *Salazar*, 567 U.S. at 194. With this interpretive lens in focus, I turn to the relevant provisions of the Self-Determination

Act.[5]

## II.    Interpretation of the Self-Determination Act

### A.    25 U.S.C. § 5325(a)

The central dispute in this case is whether the Tribe is entitled to contract support costs for its administrative expenditures associated with collecting and then recirculating revenues generated by billing third-party insurers. The Tribe argues that the district court, in answering that query in the negative, too narrowly interpreted the subsection of the Self-Determination Act that defines the contours of contract support costs, § 5325(a).

Section 5325(a) contains three relevant provisions addressing the "[a]mount of funds provided" by IHS to contracting tribes. The first two provisions provide an initial framework distinguishing between program funds and contract support costs:

---

[5] The Tribe points to two additional sources—the liberal-construction provision in the contract and a statutory provision in the Self-Determination Act—to support its view that the statute and contract must be construed in its favor. *See* § 5321(g). Notably, however, Congress enacted the statutory provision in 2020, whereas the contract governed during fiscal years 2016 and 2017. The parties have not briefed whether the timing of the provision's enactment affects § 5321(g)'s application. In any event, because I would find that the Indian canon of construction takes the Tribe as far as it needs to go to prevail in this appeal, no further discussion of these other potential interpretive guides is necessary.

(a) Amount of funds provided

    (1)  The amount of funds provided under the terms of self-determination contracts entered into pursuant to this chapter shall not be less than the appropriate [s]ecretary would have otherwise provided for the operation of the programs . . . for the period covered by the contract . . . .

    (2)  There shall be added to the amount required by paragraph (1) contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—

        (A) normally are not carried on by the respective [s]ecretary in his direct operation of the program; or

        (B) are provided by the [s]ecretary in support of the contracted program from resources other than those under contract.

§ 5325(a). Building on this initial framework, subsection (a)'s third relevant

provision further delineates two types of reimbursable contract support costs, direct

and indirect:

    (3)(A) The contract support costs that are eligible costs for the purposes of receiving funding under this chapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of—

        (i)  direct program expenses for the operation of the [f]ederal program that is the subject of the contract; and

        (ii)  any additional administrative or other expense incurred by the governing body of the Indian [t]ribe or [t]ribal organization and any overhead expense incurred by the tribal contractor in connection with the operation of the [f]ederal program, function, service, or activity pursuant to the contract,

11

> except that such funding shall not duplicate any funding provided under subsection (a)(1) of this section.

*Id.*

Interpreting these provisions, the district court concluded the statute unambiguously favored the government. Specifically, the court held that (1) a cost must satisfy the conditions of § 5325(a)(2) to be an "'eligible' cost under § 5325(a)(3)(A)," *id.* (quoting § 5325(a)(3)(A)); (2) the provisions' silence about third-party revenue indicates the Tribe is not entitled to contract support costs for administrative expenditures associated with such income; (3) the Tribe is owed contract support costs only for activities it *must* undertake under the contract, and the contract does not *require* the Tribe to collect third-party revenue; and (4) expenses generated when spending third-party revenue are not "subject or pursuant to the IHS contract" under § 5325(a)(3)(A)(i) and (ii), App. 129.

Challenging the first of these conclusions, the Tribe argues that the statute does not require that an expense under subsection (a)(3)(A) first qualify for reimbursement under subsection (a)(2). From there, the Tribe rests its statutory interpretation on subsection (a)(3)(A)'s broad language. It argues that the district court too narrowly construed the "the contracted federal program." Aplt. Br. 26. According to the Tribe, the salient point is that the contract requires the Tribe to collect third-party revenue, making expenses associated with that process part of "the operation of the [f]ederal program." § 5325(a)(3)(A).

In response, the government attempts to dispute the Tribe's statutory interpretation and defend the district court's conclusions. But—perhaps tellingly—it leads with arguments based on the contract and an IHS manual that it asserts is relevant here. Despite the government's implicit invitation to look outside the statute, the analysis must "begin with [the statute's] plain text." *Ramah Navajo Chapter*, 644 F.3d at 1062.

To start, § 5325(a)(2) explains that when certain conditions are satisfied, contract support costs "shall be added to the amount required by [subsection (a)(1)]." Then, § 5325(a)(3)(A) states that "contract support costs that are eligible costs . . . shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of" the "direct program expenses" and "any additional administrative or other expense incurred." But the statute does not inform the reader whether, to qualify as a contract support cost under subsection (a)(3)(A), subsection (a)(2)'s requirements must be met. Stated differently, nothing in subsection (a)(3)(A) explains whether that subsection creates *additional* categories of contract support costs (on top of those listed in subsection (a)(2)) or whether subsection (a)(3)(A) instead *limits* the categories of contract support costs described in subsection (a)(2). This absence is particularly telling given that Congress has shown in these very provisions that it knows how to specifically incorporate earlier ones. For instance, subsection (a)(2) refers back "to the amount required by [subsection (a)(1)]," and subsection (a)(3)(A)'s final clause likewise references subsection (a)(1). By contrast,

the disputed provisions of subsection (a)(3)(A) nowhere specifically mention subsection (a)(2).

Given this lack of clarity, there are at least two ways to interpret the relationship between the subsections. One way to read these provisions—as the Tribe asserts—is to understand subsection (a)(3)(A) as a standalone provision that describes additional categories of contract support costs. On the other hand, the government echoes the district court's reading, asserting that § 5325(a)(3)(A)(i) and (ii) do not create new categories of contract support costs. Rather, according to the government, both provisions "are limited by the requirements of § 5325(a)(2)." Aplee. Br. 20. But the government's one-sentence assertion offers no justification for concluding that this interpretation is "clearly required by [§ 5325(a)'s] statutory language."[6] *Salazar*, 567 U.S. at 194.

Thus, I would hold that the interplay between subsections (a)(2) and (a)(3)(A) is ambiguous.[7] *See Maralex Res.*, 913 F.3d at 1201. And in this context, ambiguity is

---

[6] Without elaboration, the government cites *Cook Inlet Tribal Council, Inc. v. Dotomain*, in which the D.C. Circuit held that § 5325(a)(3)(A) "does not expand the types of contract support costs" available under subsection (a)(2) but rather "divides into two the contract support costs already defined by [subsection] (a)(2)." 10 F.4th 892, 895 (D.C. Cir. 2021). To be sure, that is one possible reading of the statute. But *Cook Inlet* did not consider whether this aspect of the statute was ambiguous. *See id.* at 895–96. And the government's citation to this case, unaccompanied by any argument tethered to the language of the statute, does not establish that *Cook Inlet*'s interpretation is *required* by the statutory language. *See Salazar*, 567 U.S. at 194.

[7] Contrary to Judge Eid's suggestion, I do not reach this conclusion simply because these provisions are "complex" and interpreting them "'requires a taxing inquiry.'" Op. of Eid, J., 1, 10 (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)). I do so because, as explained above, subsections (a)(2) and (a)(3)(A) are

critical because it triggers the Indian canon of construction. Recall that under this canon, the Tribe's proffered interpretation of an ambiguous statute must be accepted if it is reasonable. *See Ramah Navajo Chapter*, 644 F.3d at 1057. And the Tribe's reading of the statute—that subsection (a)(3)(A) is a standalone provision recognizing additional categories of contract support costs—is reasonable. That's in large part because, as explained earlier, there's nothing in subsection (a)(3)(A) directly harkening back to subsection (a)(2), despite other specific cross-references included in these provisions.

Instead, as the Tribe maintains, subsection (a)(3)(A)'s "eligible costs" are reasonably read as linked to the two types of reimbursable contract support costs listed in this provision: (1) "direct program expenses for the operation of the [f]ederal program that is subject to the contract," § 5325(a)(3)(A)(i); and (2) "any additional administrative or other expense . . . and any overhead expense" the Tribe incurs "in connection with the operation of the [f]ederal program, function, service, or activity

---

"susceptible to more than one reasonable reading." *Kisor*, 139 S. Ct. at 2410; *see also Maralex*, 913 F.3d at 1201 ("A statute is 'ambiguous if it is reasonably susceptible to more than one interpretation or capable of being understood in two or more possible senses or ways.'" (quoting *Nat'l Credit Union*, 764 F.3d at 1226)). Judge Eid persuasively explains, for reasons I largely agree with, why the Tribe's reading of § 5325(a) is reasonable. But she does not explain why the government's contrary interpretation of this provision is *un*reasonable, instead merely declaring that it is. And by neglecting the government's proffered interpretation of § 5325(a), Judge Eid fails to support her conclusions that "the Tribe presents the *only* reasonable construction" and that the relevant provisions are therefore *not* ambiguous. Op. of Eid, J., 1 (emphasis added). This omission is particularly troubling given that the district court concluded that the same statutory language unambiguously favored the government's interpretation.

pursuant to the contract," § 5325(a)(3)(A)(ii). This reasonable reading of the relevant and ambiguous statutory provisions is all that is required for the Tribe's interpretation to succeed. *See Ramah Navajo Chapter*, 644 F.3d at 1057.

And as the Tribe persuasively explains, it prevails under this reasonable interpretation because its administrative costs associated with generating and then expending third-party revenue qualify under either subpart of subsection (a)(3)(A). That is, these costs can be reasonably understood as "direct program expenses for the operation of the [f]ederal program that is the subject of the contract." § 5325(a)(3)(A)(i). And these costs can also be reasonably understood as "additional administrative" or "overhead expense[s] incurred by the [Tribe] in connection with the operation of the [f]ederal program, function, service, or activity pursuant to the contract." § 5325(a)(3)(A)(ii).

The contract, which governs the Tribe's operation of the federal healthcare program, shows why. The contract unambiguously anticipates that the Tribe will bill third-party insurers, including Medicare, Medicaid, and private insurers, for healthcare services it provides. Specifically, the Tribe's scope-of-work document, which is incorporated into the contract, states that the Tribe will:

- obtain and maintain "accreditation standards in order to qualify for funds through third[-]party[ ]payers";

- "[u]se [IHS's] third-party billing system" until the Tribe is able to "set up its own functioning . . . third-party billing system";

- coordinate benefits to perform alternate resource determinations;

- ensure necessary certifications are maintained;

16

- manage claims; and

- conduct "[q]uality assurance and all third-party billing processes."

App. 105–06. These provisions plainly contemplate that the Tribe will engage in third-party billing to generate revenue. And importantly, once the Tribe establishes this infrastructure and collects third-party revenue, the Self-Determination Act requires the Tribe to deploy its program income "to further the general purposes of [its] contract" with IHS. § 5325(m)(1). Moreover, § 5325(m)(2) states that "program income earned by a tribal organization in the course of carrying out a self-determination contract . . . shall not be a basis for reducing the amount of funds otherwise obligated to the contract." That the Tribe must recirculate the third-party revenue that it earns (minus any administrative cost) further supports its contention that these administrative costs are "direct program expenses for the operation of the [f]ederal [healthcare] program" that are "incurred . . . in connection with" the operation of the federal healthcare program "pursuant to the contract." § 5325(a)(3)(A)(i)–(ii). Indeed, the Ninth Circuit recently reached a similar conclusion for that very reason. *See San Carlos Apache Tribe v. Becerra*, 53 F.4th 1236, 1242 (9th Cir. 2022) (holding that costs related to "third-party-revenue-funded healthcare activities" were performed "'in connection with'" tribe's operation of its program because "the [c]ontract requires the [t]ribe to provide third-party-funded health[]care" and thus "causes the [t]ribe to carry out those activities" (quoting § 5235(a)(3)(A)(ii)).

To evade the conclusion that these expenses satisfy subsection (a)(3)(A), the government pivots away from the statutory text, arguing instead that the statute only provides "in general terms the expenses" contract support costs are designed to cover and that the Tribe is now seeking to recover contract support costs above what it agreed to in its contract. Aplee. Br. 24. That is, the government contends that even if subsection (a)(3)(A) authorizes reimbursement for these costs, the parties' contract precludes such reimbursement. In support, the government cites an IHS manual referenced in the annual funding agreement that it contends reflects an already-negotiated amount of contract support costs. Yet the annual funding agreement—which again, forms part of the contract—states that the parties' agreed-upon calculation of contract support costs is an "estimate" that "shall be recalculated as necessary . . . to reflect the full [contract support costs] *required under* [*§ 5325*] and, *to the extent not inconsistent* with the [Self-Determination Act], as specified in [the] IHS [m]anual." App. 84 (emphasis added). And that's the rub. Reimbursement for these administrative expenditures *is* required to reflect the full contract support costs to which the Tribe is entitled under the statute. Thus, the government's reliance on the IHS manual and the initially negotiated contract support costs is to no avail. *See San Carlos Apache Tribe*, 53 F.4th at 1240 (rejecting similar argument because it "ignores the flexibility written into the [c]ontract").

Next, the government points to a separate section of the Self-Determination Act providing that program income, like the insurance reimbursements obtained by the Tribe, "shall be treated as supplemental funding to that negotiated in the funding

agreement." Aplee. Br. 25–26 (quoting 25 U.S.C. § 5388(j)). From there, the government argues that this income should also be treated as separate from the amount provided under § 5325(a)(1). The district court similarly concluded that § 5388(j) demonstrates that program income is "treated as supplemental funding to that negotiated in the funding agreement." App. 124 (quoting § 5388(j)). Yet as the government acknowledges, § 5388(j) applies only to compacts under Title V of the Self-Determination Act and not, as here, to self-determination contracts under Title I. The government clarifies that it relies on § 5388(j) to generally "illustrate[] Congress's treatment of third-party income." Aplee. Br. 26 n.9. But § 5388(j) does not squarely address the pertinent question here: whether the Tribe is entitled to reimbursement, under § 5325(a), for administrative costs associated with collecting and expending that third-party income—actions that the contract clearly anticipates the Tribe will carry out.

The government also argues (as the district court concluded) that the Tribe is entitled, but not required, to collect income from third parties like Medicare, Medicaid, and private insurers—and therefore its expenses from collecting and expending that income are not reimbursable. There are two problems with this argument. First, as explained, the contract plainly anticipates that the Tribe will set up and maintain a third-party billing system and will collect reimbursements for patients with third-party coverage. And more to the point, under the Tribe's reasonable interpretation of the statute, it doesn't matter whether the Tribe is required to collect income from third parties. The question is whether the Tribe's administrative expenditures in doing so count as "direct program expenses," § 5325(a)(3)(A)(i), or "any

19

additional administrative or other expense incurred," § 5325(a)(3)(A)(ii). For the reasons explained earlier, I would find they do.

Nevertheless, to support a narrower understanding of contract support costs, the government leans heavily on the D.C. Circuit's decision in *Swinomish Indian Tribal Community v. Becerra*, 993 F.3d 917 (D.C. Cir. 2021). There, the D.C. Circuit rejected the argument the Tribe posits here, concluding that "'the [f]ederal program' does not encompass spending insurance payments" because the statute refers to "'the [f]ederal program that is the subject of *the* contract' and 'the [f]ederal program, function, service, or activity pursuant to *the* contract.'" *Id.* at 921 (quoting § 5325(a)(3)(A)(i)–(ii)). Indeed, *Swinomish* interpreted the statutory provisions in § 5325(a)—like the district court did here—as limited to activities that "'ensure compliance with the terms of the contract' conducted by the tribe 'as a contractor.'" *Id.* at 920 (emphasis omitted) (quoting § 5325(a)(2)). In other words, *Swinomish* understood the statute to limit contract support costs exclusively to funds provided by IHS. *See id.*

But § 5325(a)'s expansive language does not support *Swinomish*'s narrow reading, as the Ninth Circuit persuasively outlined in *San Carlos Apache Tribe*, 53 F.4th 1236.[8] For one thing, the phrase "the [f]ederal program" is most naturally read

---

[8] In so doing, the Ninth Circuit relied on the Indian canon after concluding that the statutory language underlying *Swinomish*'s interpretation is at least ambiguous. *See San Carlos Apache Tribe*, 53 F.4th at 1242–43. As discussed in the paragraph above, I do not find such language ambiguous. But even if I did, the canon would require that I resolve such ambiguity in the Tribe's favor, as the Ninth Circuit did. *See id.*; *Ramah Navajo Chapter*, 644 F.3d at 1057.

as referring to "all activities required by the [c]ontract, regardless of funding source," which "encompass[es] those portions of the Tribe's healthcare program funded by third-party revenue." *San Carlos Apache Tribe*, 53 F.4th at 1242. And even if there were no way to read that phrase to include those third-party funds, such conclusion would not end the analysis because the statute "does not limit [contract support costs] to 'the [f]ederal program'" itself. *Id.* at 1243. Instead, it limits them to costs "incurred by the [Tribe] *in connection with* the operation of" that program, § 5325(a)(3)(A)(ii) (emphasis added); it therefore "contemplates that there are at least some costs *outside* of the [f]ederal program itself that require [contract support costs]," *San Carlos Apache Tribe*, 53 F.4th at 1243. And as already explained, the costs at issue satisfy that broad limit: The Tribe seeks reimbursement for administrative costs associated with services it provided pursuant to its self-determination contract with IHS, services it could not have provided without that contract.[9] *See id.* at 1241–42. So contrary to *Swinomish*'s view, the Self-Determination Act entitles the Tribe to reimbursement for those administrative costs.

Moreover, the statute's legislative purpose and history align with the Tribe's interpretation of subsection (a)(3)(A). *See Scheidler v. Nat'l Org. for Women, Inc.*, 547 U.S. 9, 19–20 (2006) (examining legislative history to support statutory interpretation); *Medina v. Cath. Health Initiatives*, 877 F.3d 1213, 1226 (10th Cir. 2017) ("A textually permissible interpretation that furthers rather than obstructs the

---

[9] For this reason, *Swinomish*'s concern that IHS could be "on the line for unlimited contract support costs" is misplaced. 993 F.3d at 921.

[statute's] purpose should be favored." (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012))). In 1994, Congress added subsections (a)(3)(A)(i) and (ii) to "assure that there is no diminution in program resources when programs, services, functions[,] or activities are transferred to tribal operation." S. Rep. No. 103-374, at 9 (1994). And as the legislative history shows, without these amendments, a tribe would be compelled to "divert program funds to prudently manage the contract, a result Congress has consistently sought to avoid." *Id.* That is what would happen (and indeed, if the Tribe's allegations are correct, what has been happening) were the Tribe required to use the third-party income it collects to cover the administrative costs associated with generating and then expending revenue from third-party insurers. *See id.*; § 5302(a) (emphasizing government's obligation to "assur[e] maximum Indian participation in the direction of . . . [f]ederal services to Indian communities"); *Ramah Navajo Chapter*, 644 F.3d at 1058 (explaining that self-determination contracts "transfer responsibility for various programs from federal agencies to the tribes themselves, while maintaining federal funding of the programs").

In this regard, the district court's decision in *Navajo Health Foundation-Sage Memorial Hospital, Inc. v. Burwell*, 263 F. Supp. 3d 1083 (D.N.M. 2016), is persuasive. There, the court granted summary judgment on this issue to a tribal organization that had entered into a self-determination contract with IHS. 263 F. Supp. 3d at 1085–86. It considered a contract that, like the one in this case, expressly provided for "billing and collecting third[-]party reimbursements." *Id.* at 1165. After

22

engaging in a lengthy review of the Self-Determination Act's legislative purpose and history, the court concluded that the Self-Determination Act had been amended to "give greater assurances that IHS would cover [t]ribes' full amount of [contract support costs]." *Id.* at 1168; *see also id.* at 1167 ("The legislative history of the [Self-Determination Act's] 1988 amendments, which first defined the term 'contract support costs,' shows that Congress was determined to counter IHS['s] persistent failure to provide full funding for the indirect costs associated with self-determination contracts.").

From there, the court considered the question at issue here: "whether funding that third parties such as Medicare, Medicaid, and private insurers provide is considered part of federal programming for the purposes of reimbursement under the [Self-Determination Act]." *Id.* at 1164. Looking to the Tribe's annual funding agreement with the government, the court answered in the affirmative, explaining that each of those third-party payers "provides funding for . . . American Indian healthcare services."[10] *Id.* at 1165.

Consistent with *Burwell*, I read § 5325(a)(3)(A)'s broad language to mandate reimbursement for "direct program expenses for the operation of the [f]ederal program that is the subject of the contract," § 5325(a)(3)(A)(i), as well as "any additional administrative or other expense incurred by the . . . Tribal organization and

---

[10] To solidify its conclusion, the district court in *Burwell* applied the Indian canon of construction, noting that the canon provided "further reason" to interpret the statutory term "'federal program[]' broadly and in [the Tribe's] favor." 263 F. Supp. 3d at 1165 (quoting § 5325(a)(3)(A)).

any overhead expense incurred by the tribal contractor in connection with the operation of the [f]ederal program, function, service, or activity pursuant to the contract," § 5325(a)(3)(A)(ii). Thus, the Tribe's expenses count as contract support costs under either of those provisions, and the Tribe is entitled to reimbursement for the administrative expenditures related to collecting and expending third-party revenue that it generated by billing third parties.

### B.    25 U.S.C. § 5326

Seeking an escape hatch, the government points to 25 U.S.C. § 5326. That statute provides:

> Before, on, and after October 21, 1998, and notwithstanding any other provision of law, funds available to the [IHS] in this Act or any other Act for Indian self-determination or self-governance contract or grant support costs may be expended only for costs directly attributable to contracts, grants[,] and compacts pursuant to the Indian Self-Determination Act and no funds appropriated by this or any other Act shall be available for any contract support costs or indirect costs associated with any contract, grant, cooperative agreement, self-governance compact, or funding agreement entered into between an Indian tribe or tribal organization and any entity other than the [IHS].

§ 5326. The government argues that under this statutory provision, IHS is not required to cover "'indirect costs associated with' funding received from third parties, as opposed to costs 'directly attributable' to the [self-determination] contract."[11] Aplee. Br. 34 (quoting § 5326). In its dismissal order, the district court similarly concluded that § 5326 barred the Tribe's claim for contract support costs

---

[11] The government criticizes *Burwell* because it did not address § 5326. But that is likely because the government defendants there did not make an argument under that provision in response to the plaintiff's summary-judgment motion.

24

because the Tribe's claimed administrative "costs" are not "'directly attributable' to the Tribe's" contract with IHS. App. 127 (quoting § 5326).

In my view, the government's argument and the district court's corresponding interpretation are mistaken. The district court imported its earlier premise—flawed, for the reasons noted above—that the only reimbursable costs were those incurred "to administer the resources and programs provided by IHS." *Id.* In the context of § 5326, the district court concluded, the expenditures for which the Tribe seeks reimbursement were "associated with agreements [it had] with Medicare, Medicaid[,] and other third-party payers" and not with the Tribe's agreement with IHS. *Id.*

The parties offer competing interpretations about how close the connection must be for a cost to be "directly attributable" to a self-determination contract rather than an "indirect cost[] associated with" some other contract. § 5326. The government contends that a cost cannot be directly attributable to the contract if the cost is indirect—as here, if the funding flows from an arrangement between the Tribe and third parties. The Tribe, to support its interpretation, points out that the contract with IHS is what triggers the availability of the funding in the first place.

Once again, because the Tribe's interpretation is reasonable, the Indian canon compels its adoption. *See Ramah Navajo Chapter*, 644 F.3d at 1057. Indeed, the Tribe's contract with IHS mandates that the Tribe implement and maintain a third-party billing system to collect reimbursements for patients with third-party insurance coverage. And once this program income has been collected, the Tribe is statutorily required to expend it to further the healthcare program. *See* § 5325(m)(1). Therefore,

25

I would conclude that the costs associated with collecting and expending this program income are "directly attributable to" the Tribe's contract with IHS, not "associated with" non-IHS agreements.[12] § 5326; *see also San Carlos Apache Tribe*, 53 F.4th at 1244 (finding § 5326 ambiguous on whether tribe's spending of third-party revenue is "'directly attributable' to the [c]ontract").

## Conclusion

Applying the Indian canon of construction, I would adopt the Tribe's reasonable interpretation to resolve the ambiguous relationship between § 5325(a)(2) and § 5325(a)(3)(A). Under that interpretation, the contract support costs sought by the Tribe—administrative expenses incurred in connection with the Tribe's contractually anticipated collection and expenditure of third-party income—are direct

---

[12] Unlike my colleagues, I do not read § 5326 as stating "two [independent] restrictions on the funds a tribe can receive." Dissent 2; *see also* Op. of Eid, J., 6. That is, I do not read the statute as both (1) requiring that costs be "directly attributable to" the Tribe's contract with IHS *and* (2) precluding reimbursement for "indirect costs associated with" non-IHS contracts. § 5326. Instead, like the parties, I read § 5326 as stating two different sides of the same limitation: On one side, "funds *available to*" IHS "may be *expended* only for costs *directly attributable* to" self-determination contracts; on the other, "no funds *appropriated by*" IHS to tribes "shall be *available* for any . . . *indirect costs associated with* any [non-IHS] contract." *Id.* (emphases added). Contrary to Judge Baldock's view, the fact that Congress linked these two inverse clauses with the word "and" does not automatically convert them into independent requirements. *See Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.*, 963 F.3d 982, 990 (9th Cir. 2020) ("[J]ust because the ordinary meaning of 'and' is typically conjunctive does not mean 'and' cannot take on other meanings in context."). And at the very least, § 5326 does not unambiguously support such a reading. So under the Indian canon, the Tribe's reasonable interpretation—that costs "directly attributable" to an IHS contract are necessarily not "associated with" a non-IHS contract (and vice versa)—must be accepted. § 5326; *see also Ramah Navajo Chapter*, 644 F.3d at 1057.

expenses incurred while operating the healthcare program that is the subject of its contract with IHS. *See* § 5325(a)(3)(A)(i). These expenses are also incurred "in connection with the operation of the [f]ederal program" that it contracted to run. § 5325(a)(3)(A)(ii). Again applying the Indian canon, I would reject the government's contention that § 5326 bars the Tribe's claim for contract support costs because, contrary to the government's contention, the Tribe's costs are directly attributable to the contract. With Judge Eid's separate opinion and this opinion, a majority of this panel reverses and remands to the district court for further proceedings.

No. 21-8046, *Northern Arapaho Tribe v. Becerra*

**EID**, Circuit Judge, concurring in the judgment.

I agree with Judge Moritz that the statutory scheme in question supports the Tribe's position, but I reach that result by taking a different path. Judge Moritz finds that both the Tribe and the government put forth reasonable interpretations of the statutory language and then employs the Indian canon of statutory construction to break the tie in favor of the Tribe. *See* Moritz op. at 2–3. The statutory scheme here is undoubtedly complex and requires a good deal of analysis, but that does not mean that it is ambiguous. In my view, the Tribe presents the only reasonable construction because the government's interpretation vitiates much of the statutory scheme. Accordingly, I respectfully concur only in the judgment.

The Indian Self-Determination and Education Assistance Act ("ISDEAA") provides that when a tribe contracts with the federal government to provide its own services—like healthcare—the tribe receives whatever funds the government would have spent to run the program had it provided those services directly. This is called the "[s]ecretarial amount." Aplt. Br. at 5; Aple. Br. at 4. But a tribe faces additional costs that the federal government need not incur to operate the same system, including, for example, the costs of audits, workers' compensation insurance (which often involves paying into state-run programs), and taxes. The ISDEAA adds "contract support costs" to the secretarial amount to cover these items. 25 U.S.C. § 5325(a)(2), (a)(3)(A).

1

The statute broadly defines "contract support costs." *See id.* § 5325(a)(2)–(3). Contract support costs "shall consist of an amount for the reasonable costs for activities [that] must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management" but that (A) the federal government does not normally incur when directly operating the program or (B) the relevant agency provides "in support of the contracted program from resources other than those under contract." *Id.* § 5325(a)(2). Moreover, "[t]he contract support costs that are eligible costs for the purposes of receiving funding under this chapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of" (i) "direct program expenses for the operation of the Federal program that is the subject of the contract" and (ii) "any additional administrative or other expense incurred by the governing body of the Indian Tribe or Tribal organization and any overhead expense incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract." *Id.* § 5325(a)(3)(A). The statute states that contract support cost funding "shall not duplicate any funding provided under subsection (a)(1)," which provides for the secretarial amount. *Id.*; *see also id.* § 5325(a)(1).

In other words, the statute provides that "[t]he contract support costs that are eligible costs for the purposes of receiving funding under this chapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of" both (i) "direct program expenses" and (ii) "any additional administrative or other

2

expense" that the tribe incurs and "any overhead expense" that "the tribal contractor [incurs] in connection with the operation of the Federal program, function, service, or activity pursuant to the contract." *Id.* § 5325(a)(3)(A). "[C]ontract support costs" is thus a very broad term. *Id.*

A tribe's funding arrangement is complicated by the complexities of the modern healthcare system. The federal government's Indian Health Service ("IHS") does not fund a contracting tribe's healthcare system in a vacuum. Healthcare is increasingly funded by reimbursements from non-tribe, non-IHS, third-party payors such as Medicare, Medicaid, and private insurers.[1] These revenues are called "program income," 25 U.S.C. § 5325(m), and they reimburse a provider's direct expenses.

Notably, by statute, the amount IHS must pay a tribe because of the contract is not reduced when a tribe collects program income. *See id.* § 5325(m)(2). The statute explicitly provides that "program income earned by a tribal organization in the course of carrying out a self-determination contract . . . shall not be a basis for reducing the amount of funds otherwise obligated to the contract." *Id.* § 5325(m). Funds authorized by law and directly provided for in the contract are clearly "obligated to the contract." *Id.* § 5325(m)(2). Likewise, because contract support costs stem from activities that a tribe must undertake "to ensure compliance with the terms of the

[1] *See* Medicaid & CHIP Payment & Access Comm'n, *Medicaid's Role in Health Care for American Indians and Alaska Natives* 5–6 (2021), https://www.macpac.gov/wp-content/uploads/2021/02/Medicaids-Role-in-Health-Care-for-American-Indians-and-Alaska-Natives.pdf.

3

contract and prudent management" and because the statute requires that contract support costs be paid because of the IHS contract, *id.* § 5325(a)(2), they are "funds [] obligated to the contract." *Id.* § 5325(m)(2). Therefore, the secretarial amount and the amount of reimbursement for contract support costs that are authorized and required by the contract and by statute may not be reduced because of program income. *See id.*; *see also id.* § 5388(j) (stating that "[a]ll Medicare, Medicaid, or other program income earned by an Indian tribe shall be treated as supplemental funding to that negotiated in the funding agreement" and "shall not result in any offset or reduction in the amount of funds the Indian tribe is authorized to receive under its funding agreement . . .").

A tribe with an ISDEAA contract will already be fully reimbursed through the secretarial amount and contract support costs; and, therefore, program income is extra money on top of basic reimbursement. However, a tribe does not simply receive a windfall. The statute provides that "program income . . . shall be used by the tribal organization to further the general purposes of the contract." *Id.* § 5325(m). That is, the statutory text contemplates this additional money and requires the tribe to inject it back into its healthcare program.

The Northern Arapaho Tribe contracts with the federal government to provide healthcare on the reservation that the government would otherwise be obligated to provide. IHS refused to provide the Tribe with contract support costs corresponding to the portion of its healthcare system funded with program income. The issue here

4

is whether tribes are owed "contract support costs" on the program income that they receive and then spend on more programming.

As laid out above, the term "contract support costs" has a broad meaning. Additionally, the government cannot pay less because of program income, which the statute requires to be injected back into the Tribe's program and which itself only exists because of the IHS contract. *See id.* § 5325. Also, the Tribe's contract—the relevant provisions of which Judge Moritz lays out, *see* Moritz op. at 16–17 (quoting App'x at 105–06)—"plainly contemplate[s] that the Tribe will engage in third-party billing to generate revenue," *id.* at 17. Based on the plain meaning of both the contract and § 5325, the Tribe must be reimbursed for these contract support costs.

As Judge Moritz points out, *see id.* at 24–26, it is true that § 5326 of the statute provides limits on recovering contract support costs, *see* 25 U.S.C. § 5326.[2] And these limits exist "notwithstanding any other provision of law." *Id.* While Judge Moritz focuses largely on the first portion of § 5326, *see* Moritz op. at 24–26, I do

---

[2] That provision states in full:

> Before, on, and after October 21, 1998, and notwithstanding any other provision of law, funds available to the Indian Health Service in this Act or any other Act for Indian self-determination or self-governance contract or grant support costs may be expended only for costs directly attributable to contracts, grants and compacts pursuant to the Indian Self-Determination Act and no funds appropriated by this or any other Act shall be available for any contract support costs or indirect costs associated with any contract, grant, cooperative agreement, self-governance compact, or funding agreement entered into between an Indian tribe or tribal organization and any entity other than the Indian Health Service.

25 U.S.C. § 5326.

not read § 5326 as establishing two mutually exclusive conditions—where, for example, the cost being "directly attributable" to the IHS contract automatically makes the cost not be "associated with" a non-IHS contract, *see* Aple. Br. at 34. I instead read § 5326 to contain two similar statutory conditions that must both be met.

First, § 5326 limits contract support cost recovery to "costs *directly attributable* to contracts, grants and compacts pursuant to the Indian Self-Determination Act." 25 U.S.C. § 5326 (emphasis added). The costs incurred when spending program income are "directly attributable" to the Tribe's self-determination contract. Because of the contract, the Tribe takes control of its healthcare services and is required to spend the program income it has accepted as a "prudent" provider on more healthcare services. *Id.* § 5325(a)(2); *see also id.* § 5325(m)(1). The contract—which incorporates the statute—thus contemplates and requires spending program income "to further the general purposes of the contract." *Id.* § 5325(m)(1). The contract support costs associated with the required spending of program income—including costs associated with collecting and spending program income—are, therefore, "directly attributable" to the contract. To hold otherwise would be to hold that costs contemplated by the contract and required by the statute are not directly attributable to the contract. In sum, such a contradictory interpretation—one that is adopted by the government, *see* Aple. Br. at 34–35—would ignore the mandatory aspect of the spending.

Second, § 5326 prohibits the government from paying "for any contract support costs or indirect costs *associated with* any contract, grant, cooperative

6

agreement, self-governance compact, or funding agreement entered into between an Indian tribe or tribal organization and any entity other than the Indian Health Service." 25 U.S.C. § 5326 (emphasis added). The costs incurred when collecting and spending program income are not "associated with" non-IHS agreements, at least under any interpretation of the statute that does not destroy it entirely. Contracting is ubiquitous. As one court has observed, the "literal requirement that no funds from any appropriation whatever, including other agency appropriations, may ever be used to pay costs 'associated with' other agencies would . . . eliminat[e] the possibility of funding any indirect costs at all." *Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 417 (D.D.C. 2008). Likewise, a broad reading of this phrase would vitiate most, if not all, of the ISDEAA's explicit contract support costs funding. One can easily imagine many non-IHS agreements that would be "associated with" traditional contract support costs incurred by contracting tribes under the broad reading of the phrase. Under this reading, the contract support costs incurred when a tribe conducts federally required audits might be said to be "associated with" the tribe's contract hiring an auditor. Additionally, under the expansive reading proposed by the government, this could also be said about the tribe's contracts with insurers involved in obtaining and paying for workers' compensation insurance— which often involves paying into state-run programs. Moreover, the contract support costs incurred when a tribe computes its tax obligations might be said to be "associated with" the tribe's agreement with its accounting firm under the government's reading. Adopting such an expansive reading of the "associated with"

7

language would foreclose recovery of all of these costs. But that would eliminate the meaning of much of § 5325; and, therefore, the interpretation must be rejected as unreasonable. *Cf. Standing Akimbo, Inc. v. United States*, No. 21-1379, 2023 WL 569405, at *5 n.5 (10th Cir. Jan. 27, 2023) (unpublished) (noting that the court would "not extend the Anti-Injunction Act to summons proceedings . . . because such an extension would directly conflict with (and possibly moot) the statutory scheme entitling taxpayers to challenge summonses in the district court").

The dissent agrees that the language of § 5325 unambiguously entitles the Tribe to the funds it seeks. *See* diss. op. at 2. But then it concludes that § 5326 unambiguously takes those funds away. *See id.* at 4. I disagree with this analysis.

In the dissent's view, the "notwithstanding" clause of § 5326, which imposes the two requirements of the section "notwithstanding any other provision of law," impliedly repeals the language of § 5325. It then concludes that § 5326, when considered in isolation, disallows the funds at issue in this case. But the "notwithstanding" clause does not come into play unless there is a conflict between the two provisions in question in the first place. *See Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (citing *Shomberg v. United States*, 348 U.S. 540, 547–48 (1995)) ("As we have noted previously in construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override *conflicting* provisions of any other section." (emphasis added)). Here, there is no conflict.

Contract support costs incurred when collecting and spending program income are both "directly attributable" to the IHS contract and "associated with" the IHS contract—not contracts with other entities—for purposes of § 5326. 25 U.S.C. § 5326; *see also San Carlos Apache Tribe v. Becerra*, 53 F.4th 1236, 1244 (9th Cir. 2022) ("This spending occurs only because the Contract allows the Tribe to recover the insurance money and requires the Tribe to spend it."). Any contractual arrangements the Tribe may have with third parties that facilitate receiving program income are subordinate to the agreement with IHS to expend all program income "to further the general purposes of the [IHS] contract." 25 U.S.C. § 5325(m)(1). The program income is earned by operating the funded activities pursuant to the self-determination contract, not from unrelated activities. Also, the relevant costs for reimbursement purposes are incurred in connection with spending program income on more healthcare activities (as the self-determination contract and the ISDEAA require), not in connection with any contractual obligations to third parties. *See San Carlos Apache Tribe*, 53 F.4th at 1241–43. The connection to third parties is thus highly attenuated.

In sum, I reject the government's position not because it reaches an absurd result, *see* diss. op. at 4, but because we should not read § 5326 as vitiating the text of § 5325 when we can give effect to both sections without straining the text.

In the end, there is no question that the statutory scheme and its intersection with the contract in place in this case is complex. However, "[a] regulation is not ambiguous merely because 'discerning the only possible interpretation requires a

9

taxing inquiry.'"  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting)).  The same holds true for statutes.  These statutes are not ambiguous.  Here, I would find that the Tribe presents the only reasonable construction of the statutory scheme because the government's view vitiates much of the scheme without a conflict sufficient to invoke the "notwithstanding" clause and, therefore, must be rejected.  Accordingly, I concur only in Judge Moritz's judgment.

No. 21-8046, *Northern Arapaho Tribe v. Becerra*

**BALDOCK**, Circuit Judge, dissenting in part.

Let me begin by acknowledging the complexity of the statutory scheme we consider today. My colleagues and I cannot reach a consensus on its meaning. This fact alone speaks volumes about Congress's ability to draft a coherent statute. But we do not make the law. We can only interpret and apply it to the best of our ability in the cases that come before us, and that is what we have done here.

In this case, we are asked to determine whether the Northern Arapaho Tribe is entitled to additional "contract support costs" to cover the administration of "program income"—funds received from third-party payors—under the terms of the Indian Self-Determination and Education Assistance Act ("ISDEAA"). To answer that question, we consider two provisions from the ISDEAA: 25 U.S.C. § 5325 and 25 U.S.C. § 5326. According to Judge Moritz, the language of these provisions is ambiguous, meaning that the Tribe prevails through the Indian canon of construction. Judge Eid agrees that the Tribe prevails but offers the view that the statutory language is unambiguous, and that the Tribe wins under its plain language. I agree with Judge Eid that § 5325 is unambiguous and that under its terms, the Tribe wins. That, however, is not the end of the story. Section 5325 is limited by § 5326. I cannot join the interpretation of § 5326 offered by either of my colleagues. Its language is unambiguous, and the Tribe cannot receive the funds it seeks when § 5326 is applied as written. I therefore respectfully dissent.

1

We face two questions of statutory interpretation in this case. First, we must ask whether the Tribe is entitled to receive the funds it seeks under § 5325. The Panel's unanimous answer to that question is "yes." As Judge Eid explains in her concurrence, the statute unambiguously provides that "contract support costs" include "both (i) 'direct program expenses' and (ii) 'any additional administrative or other expense' that the tribe incurs and 'any overhead expense' that 'the tribal contractor [incurs] in connection with the operation of the Federal program, function, service, or activity pursuant to the contract.'" Concurrence 2 (quoting § 5325(a)(3)(A)). Based on the plain language of this provision, and the other relevant provisions of § 5325, I have little difficulty concluding that the Tribe is entitled to the funds it seeks under that section, at least when it is considered in a vacuum.

I similarly believe the language of § 5326 is unambiguous. Section 5326 provides:

Before, on, and after October 21, 1998, and notwithstanding any other provision of law, funds available to the Indian Health Service in this Act or any other Act for Indian self-determination or self-governance contract or grant support costs may be expended only for costs directly attributable to contracts, grants and compacts pursuant to the Indian Self-Determination Act and no funds appropriated by this or any other Act shall be available for any contract support costs or indirect costs associated with any contract, grant, cooperative agreement, self-governance compact, or funding agreement entered into between an Indian tribe or tribal organization and any entity other than the Indian Health Service.

Thus, this provision imposes two restrictions on the funds a tribe can receive. First, the costs must be "directly attributable" to the Tribe's contract with IHS for it to receive reimbursement. Second, the costs cannot be "associated with any contract . . . entered into

2

between an Indian tribe . . . and any entity other than the Indian Health Service." [1]  § 5326.

These limitations apply "notwithstanding any other provision of law" and expressly

constrain the funds available under the ISDEAA "or any other Act."  *Id.*  Because the two

requirements are joined conjunctively, both conditions must be satisfied to comply with

the statute.  *See, e.g.*, *United States v. Fredette*, 315 F.3d 1235, 1244 (10th Cir. 2003);

*United States v. Browning*, 252 F.3d 1153, 1160 (10th Cir. 2001).

Even assuming for the sake of argument that the Tribe can pass the "directly

attributable" prong by showing that its contract with IHS "contemplate[s]" the Tribe doing

business with third-party payors, *see* Slip Op. 16–17, 24–26; Concurrence 5–6, I struggle

to see how the Tribe can get past the "associated with" prong.  To be sure, the first prong

requires a tight nexus between the costs at issue and the Tribe's contract with IHS to be

reimbursable while the second prong only requires a loose nexus between the costs and a

contract with a third-party for the same costs to be excluded from reimbursement.  And

Judge Eid may be right that this provision could exclude a variety of other contract support

costs and indirect costs.  *See* Concurrence 7–8.  But that is what § 5326 says.  Although we

abide by the principle that if "a plain language interpretation of a statute would lead to an

absurd outcome which Congress clearly could not have intended, we employ the absurdity

exception to avoid the absurd result," this is not one of the occasions when the result is one

---

[1] According to a recent Ninth Circuit decision, § 5326 poses no obstacle to the Tribe's recovery.  *See San Carlos Apache Tribe v. Becerra*, 53 F.4th 1236, 1243–44 (9th Cir. 2022).  But the Ninth Circuit's brief analysis only addressed the "directly attributable" prong and its conclusory statement that it is "not clear that [§ 5326] unambiguously means that this spending is *not* 'directly attributable' to the Contract" does not persuade me to change my view of the statute.  *Id.* at 1244.

that Congress did not intend. *In re McGough*, 737 F.3d 1268, 1276 (10th Cir. 2013) (citing

*Resolution Trust Corp. v. Westgate Partners Ltd.*, 937 F.2d 526, 529 (10th Cir. 1991)).

After all, Congress expressly employed language stating that the rules enunciated in § 5326

trump those in other provisions of the statute. Accordingly, I would read § 5326 as a

superseding provision that bars the Tribe from receiving the funds it seeks even though

§ 5325 would otherwise allow it.

My colleagues, however, do not share this view. Instead, they have each worked

hard to read § 5326 as saying something other than what it says.[2] But as I have discussed,

§ 5326's language is plain and unambiguous. If § 5326 does not bar the Tribe from

receiving the costs in question, I struggle to see when it would apply or what purpose it

would serve. Congress chose to draft a clear and broadly applicable statute. In my view,

the Tribe's issue with § 5326 is better addressed by Congress than by us. I respectfully

dissent.

---

[2] Judge Eid cites our recent decisions, *Standing Akimbo, Inc. v. United States*, No. 21-1379, 2023 WL 569405 at *5 n.5 (10th Cir. Jan. 27, 2023) (unpublished), to support her view that my reading of § 5326 "would eliminate the meaning of much of § 5325" and "must be rejected as unreasonable." Concurrence 8. Specifically, Judge Eid highlights our rejection of the IRS's argument that the Anti-Injunction Act barred us from exercising jurisdiction in that case. *Id.* But that discussion is an inapposite comparison with this case. In *Standing Akimbo*, we concluded the Anti-Injunction Act did not apply because the Taxpayers did not seek an injunction. 2023 WL 569405 at *5 n.5. We also explained that expanding the Anti-Injunction Act to cover summons proceedings would undermine a *separate* statutory scheme granting taxpayers the right to challenge third-party summons issued by the IRS. *See id.* In contrast, this case involves two provisions of the same statutory scheme. Furthermore, even if *Standing Akimbo* was directly on point (which it is not), it is unpublished authority. And the unpublished decisions of this Court are merely persuasive.

4