*PRELIMINARY PRINT*

VOLUME 602 U. S. PART 1

PAGES 222–256

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 6, 2024

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.   Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# BECERRA, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL. *v.* SAN CARLOS APACHE TRIBE

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 23–250.   Argued March 25, 2024—Decided June 6, 2024*

The Indian Self-Determination and Education Assistance Act, 25 U. S. C. § 5301 *et seq.*, enables an Indian tribe to enter into a "self-determination contract" with the Indian Health Service to assume responsibility for administering the healthcare programs that IHS would otherwise operate for the tribe. § 5321(a)(1).  When IHS administers such programs itself, it funds its operations through congressional appropriations and third-party insurance payments.  Healthcare programs administered by a tribe under a self-determination contract have a parallel funding structure.  First, IHS must provide to the tribe the Secretarial amount, which "shall not be less" than the congressionally appropriated amount that IHS would have used to operate such programs absent the self-determination contract. § 5325(a)(1).  Second, like IHS when it runs the healthcare programs, a contracting tribe can collect revenue from third-party payers like Medicare, Medicaid, and private insurers.  See 42 U. S. C. §§ 1395qq(a), 1396j(a); 25 U. S. C. § 1621e(a).  These third-party funds are called "program income" and must be used by the tribe "to further the general purposes of the contract" with IHS. § 5325(m)(1).

The Secretarial amount and program income, however, do not place a contracting tribe on equal footing with IHS.  That is because the tribe must incur certain overhead and administrative expenses that IHS does not incur when it runs the healthcare programs.  To remedy this funding shortfall, Congress amended ISDA to require IHS to pay the tribe "contract support costs" to cover such "reasonable costs for activities which must be carried on by a [tribe] as a contractor to ensure compliance with the terms of the [self-determination] contract." § 5325(a)(2).  Contract support costs eligible for repayment include "direct program expenses for the operation of the Federal program" and "any additional administrative or . . . overhead expense incurred by the [tribe] in connection with the operation of the Federal program, function, service, or activity pursuant to the contract." § 5325(a)(3)(A).  Such costs are lim-

—————

*Together with No. 23–253, *Becerra* v. *Northern Arapaho Tribe*, on certiorari to the United States Court of Appeals for the Tenth Circuit.

ited, however, to those "directly attributable to" self-determination contracts.  §5326.  And no funds are available for "costs associated with any contract . . . entered into between [a tribe] and any entity other than [IHS]."  *Ibid.*

These cases involve self-determination contracts between IHS and two tribes—the San Carlos Apache Tribe and the Northern Arapaho Tribe.  Both Tribes sued the Government for breach of contract, contending that although they used the Secretarial amount and program income to operate the healthcare programs they assumed from IHS under their self-determination contracts, IHS failed to pay the contract support costs they incurred by providing healthcare services using program income.  The Ninth and Tenth Circuits concluded that each Tribe was entitled to reimbursement for such costs.

*Held*: ISDA requires IHS to pay the contract support costs that a tribe incurs when it collects and spends program income to further the functions, services, activities, and programs transferred to it from IHS in a self-determination contract.  Pp. 233–243.

(a) Sections 5325(a)(2) and (a)(3)(A) peg contract support costs to the requirements of a self-determination contract.  Section 5325(a)(2) defines contract support costs as "the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract."  If a tribe therefore must collect and spend program income to ensure compliance with its contract, then the reasonable administrative and overhead costs it incurs in doing so are "contract support costs."

Each self-determination contract entered into under ISDA incorporates Section 5325(m)(1), which requires a contracting tribe to use "program income earned . . . in the course of carrying out a self-determination contract" to "further the general purposes of the contract."  See §§5329(a)(1), (c).  The purposes of the contract are the "functions, services, activities, and programs" transferred from IHS to the tribe in its contract.  See §5329(c) (requiring a "purpose" clause listing the "functions, services, activities, and programs" to be transferred from IHS to the tribe).  When the tribe uses program income to further the functions, services, activities, and programs it assumed from IHS and incurs reasonable costs for required support services, those costs are "contract support costs" under Section 5325(a)(2).

Those costs are also "eligible costs for the purposes of receiving funding" under Section 5325(a)(3)(A), which specifies that both direct and indirect contract support costs may be reimbursed.  Direct contract support costs are "direct program expenses for the operation of the Federal program that is the subject of the contract."  §5325(a)(3)(A)(i).

When a tribe spends program income to further the functions, services, activities, and programs that it agrees to administer in IHS's stead under its self-determination contract and incurs direct contract support costs, those costs are incurred "for the operation of the Federal program that is the subject of the contract" and are thus eligible for reimbursement. Indirect contract support costs are "any additional administrative or other expense . . . incurred by [a tribe] in connection with the operation of the Federal program, function, service, or activity pursuant to the contract." §5325(a)(3)(A)(ii) (Supp. III). When a tribe spends program income to further the functions, services, activities, and programs that it assumes from IHS and incurs indirect contract support costs, those costs are incurred "in connection with the operation of the Federal program, function, service, or activity pursuant to the contract" and are thus eligible for reimbursement.

The self-determination contracts of the Tribes require them to collect program income. Once the Tribes collect such income, they are contractually required to use it. The Tribes aver that they have collected and spent program income as required by their contracts to carry out the operations IHS transferred to them. The reasonable direct and indirect contract support costs they incurred as a result are eligible for repayment under Section 5325(a) because they were incurred to "ensure compliance with the terms of the contract," §5325(a)(2), and "for the operation of" and "in connection with the operation of" the "Federal program" they assumed from IHS, §5325(a)(3)(A). Pp. 233–236.

(b) The limitations in Section 5326 do not preclude payment of costs incurred by the required spending of program income under a self-determination contract. When a tribe spends program income to further the healthcare programs it assumes from IHS and incurs contract support costs, the costs it incurs are "directly attributable" to the self-determination contract. And such costs are not "associated with" any contract between the tribe and a third party. They are instead "associated with" the contract that requires the work that generates the support costs—the self-determination contract. The history of Section 5326 confirms this analysis. Pp. 237–239.

(c) The Government's arguments to the contrary find no support in ISDA's text. Pp. 239–240.

(1) Contrary to the Government's assertion, nothing in Section 5325(a)(2) suggests that contract support costs are *limited* to programs funded by the Secretarial amount. In fact, Section 5325(a)(2) defines contract support costs as tied to "the terms of the contract," which require tribes to fund programs with program income. Nor does the Government cite any statutory text to support its assertion that the contract support costs of spending program income are ineligible for

Syllabus

repayment under Section 5325(a)(3)(A) because the "Federal program" comprises only the Secretarial amount. That provision refers to eligible costs for the operation of the "Federal program" without limiting that program to the Secretarial amount. P. 239.

(2) The Government also argues that tribes should not get contract support costs for spending program income because that would give them flexibility to spend such income on a broader range of activities than IHS can. But the differences cited by the Government do not withstand scrutiny. First, the difference between IHS's and a tribe's ability to offer healthcare services to non-Indians is irrelevant because both must make the same determination before either can offer such services: Whether such services will result in a denial or diminution of services to eligible Indians. §§ 1680c(c)(1)(B), (c)(2). Next, although IHS must "first" use Medicare and Medicaid proceeds to ensure compliance with those programs, a tribe must also use such proceeds to ensure compliance with those programs. §§ 1641(c)(1)(B), (d)(2)(A). Finally, although tribes might have greater ability to expand their operations because they, unlike IHS, are not prohibited from using Medicare and Medicaid proceeds to construct new facilities, to the extent that a tribe expands its programs beyond the "Federal program," IHS would not have to pay contract support costs for the tribe's new programs. Pp. 239–240.

(d) A contrary reading of the statute would impose a penalty on tribes for opting in favor of greater self-determination. Contract support costs are necessary to prevent a funding gap between tribes and IHS. If IHS does not cover those costs to support a tribe's expenditure of program income, the tribe would have to divert some program income to pay such costs, or it would have to pay them out of its own pocket. Either way, it would face a penalty for pursuing self-determination, contrary to the policy underlying ISDA. Pp. 241–243.

No. 23–250, 53 F. 4th 1236; and No. 23–253, 61 F. 4th 810, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which SOTOMAYOR, KAGAN, GORSUCH, and JACKSON, JJ., joined. KAVANAUGH, J., filed a dissenting opinion, in which THOMAS, ALITO, and BARRETT, JJ., joined, *post*, p. 243.

*Caroline A. Flynn* argued the cause for petitioners in both cases. With her on the briefs were *Solicitor General Prelogar*, *Principal Deputy Assistant Attorney General Boynton*, *Deputy Solicitor General Kneedler*, *Daniel Tenny*, and *Joshua Dos Santos*.

*Adam G. Unikowsky* argued the cause for respondent in
No. 23–253. With him on the brief were *Keith M. Harper*,
*Charles W. Galbraith*, *Leonard R. Powell*, *Geoffrey D.
Strommer*, *Caroline P. Mayhew*, *Stephen D. Osborne*, and *El-
liott A. Milhollin*. *LLoyd B. Miller* argued the cause for
respondent in No. 23–250. With him on the brief were *Rebe-
cca A. Patterson*, *Whitney A. Leonard*, *Chloe E. Cotton*, *Car-
ter G. Phillips*, *Virginia A. Seitz*, and *Eric D. McArthur*.*

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

The Indian Self-Determination and Education Assistance
Act (ISDA), 88 Stat. 2203, 25 U. S. C. § 5301 *et seq.*, enables
an Indian tribe to enter into contracts with the Indian Health
Service (IHS) to assume responsibility for administering the
healthcare programs that IHS would otherwise operate for
the tribe. To fund the tribe's administration of such pro-
grams, IHS must turn over to the tribe the appropriated
funds the agency would have used to operate the programs,
as well as an additional sum to cover "contract support
costs." § 5325(a). These costs are administrative expenses
incurred by the tribe that IHS does not incur when it runs
the programs, typically because the agency can rely on exist-
ing Government resources unavailable to the tribe. The
tribe may also collect funds due from third parties—such as
Medicare, Medicaid, and private insurers—to help finance

---

*Briefs of *amici curiae* urging affirmance in both cases were filed for
the Coalition of Large Tribes et al. by *Jennifer H. Weddle*, *Troy A. Eid*,
*John E. Echohawk*, *Melody L. McCoy*, *Kim Jerome Gottschalk*, *Morgan
Saunders*, *Josh Newton*, and *Howard G. Arnett;* for Legal Scholars by *Seth
P. Waxman*, *Kevin M. Lamb*, *Laura E. Powell*, and *Monte Mills*, *pro se*;
for NAFOA by *C. Bryant Rogers*, *Hyland Hunt*, and *Ruthanne M. Deutsch*;
for the National Congress of American Indians et al. by *Steven D. Gordon*,
*Philip M. Baker-Shenk*, and *James T. Meggesto*; and for the National In-
dian Health Board et al. by *Andrew B. Brantingham*, *Vernle Charles
(Skip) Durocher, Jr.*, *Anthony Jones*, *Robert R. Yoder*, and *Steven Boos*.

the programs. The question before us is whether ISDA requires IHS to pay contract support costs to support tribal programs funded by such third-party payments.

I

In 1975, Congress passed ISDA to promote "effective and meaningful participation by the Indian people in the planning, conduct, and administration" of federal healthcare programs. §5302(b). Such programs provide, for instance, hospitals, dental clinics, and ambulance services. After ISDA's enactment, a tribe can either continue receiving healthcare services directly from the Federal Government through IHS, or it can assume responsibility for administering those services itself. If a tribe elects the latter route, ISDA obligates IHS to enter into a "self-determination contract" with the tribe. §5321(a)(1). Under this contract, the tribe receives funds to operate federal healthcare programs that IHS previously operated for the tribe's members.

When IHS administers healthcare programs itself, it funds its operations through congressional appropriations and third-party insurance payments. Historically, IHS's funding came from "moneys as Congress may from time to time appropriate." §13. But in 1976 Congress enacted the Indian Health Care Improvement Act (IHCIA), 90 Stat. 1400, 25 U. S. C. §1601 *et seq.*, to create greater parity between IHS and other healthcare providers. After IHCIA, when IHS provides healthcare services to a tribal member with Medicare, Medicaid, or private insurance coverage, IHS may collect the funds due from those third-party insurers for the services provided to the insured tribal member. See 42 U. S. C. §§1395qq(a), 1396j(a); 25 U. S. C. §1621e(a). Congress specified that third-party collections "shall not be considered in determining appropriations" for IHS. 25 U. S. C. §1641(a). Third-party payments now represent a "significant portion" of IHS's tribal healthcare budget—over $1.8

billion in 2024 alone. Dept. of Health and Human Servs., Fiscal Year 2024, Indian Health Service: Justification of Estimates for Appropriations Committees, p. CJ–193 (2023).

Healthcare programs administered by tribes under self-determination contracts have a parallel funding structure. First, IHS provides to the tribes the appropriated funds that IHS would have used to operate such programs absent the self-determination contract. ISDA specifies that this sum— called the Secretarial amount—"shall not be less" than the Secretary of Health and Human Services would have otherwise allocated for the operation of the programs during the period covered by the contract. §5325(a)(1).

Second, like IHS when it runs the healthcare programs, contracting tribes can collect revenue from third-party payers like Medicare, Medicaid, and private insurers. See 42 U. S. C. §§1395qq(a), 1396j(a); 25 U. S. C. §1621e(a). ISDA calls the funds received from third-party payers "program income" and requires that tribes use those funds "to further the general purposes of the contract" with IHS. §5325(m)(1). Just as third-party collections are not considered in determining IHS's appropriations, Congress has specified that a tribe's program income "shall not be a basis for reducing" the Secretarial amount. §5325(m)(2); see §1641(a).

The Secretarial amount from IHS and program income from third-party payers do not, however, place contracting tribes on equal footing with IHS. Tribes incur overhead and administrative expenses that IHS does not incur when it runs the healthcare programs. For example, as a federal agency, IHS does not have to pay state-mandated workers' compensation on the salaries of its doctors—but the tribes do. IHS can also rely on other federal agencies, such as the Office of Personnel Management, for general administrative functions—but the tribes cannot. They have to manage on their own dime the auditing, insurance, financial, personnel, and other management systems associated with providing healthcare under self-determination contracts.

To address this systematic shortfall in funding, Congress amended ISDA to account for "contract support costs." IHS is now required to cover such "reasonable costs for activities which must be carried on by a [tribe] as a contractor to ensure compliance with the terms of the [self-determination] contract." § 5325(a)(2). Contract support costs eligible for repayment include "direct program expenses for the operation of the Federal program" and "any additional administrative or . . . overhead expense incurred by the [tribe] in connection with the operation of the Federal program, function, service, or activity pursuant to the contract." § 5325(a)(3)(A). These categories of contract support costs are recoverable so long as they do not duplicate any funding provided through the Secretarial amount. *Ibid.* Contract support costs are limited, however, to "costs directly attributable to" self-determination contracts. § 5326. And no funds are available for "costs associated with any contract . . . entered into between [a tribe] and any entity other than [IHS]." *Ibid.*

## II

These cases involve self-determination contracts between the IHS and two tribes: The San Carlos Apache Tribe and the Northern Arapaho Tribe.

### A

The San Carlos Apache Tribe is located on the San Carlos Apache Indian Reservation, which was established in 1871 and encompasses 1.8 million acres spanning three counties in southeastern Arizona. In 2011, the Tribe entered into a three-year self-determination contract with IHS. The Tribe agreed to assume control of and manage the Community Health Representative Program, Emergency Medical Services Program, Alcohol and Substance Abuse Program, Behavioral Health Services Program, Teen Wellness Program, and Health and Human Services. App. 52. In accordance with the ISDA "model agreement" set forth in Section 5329(c), the Tribe's contract incorporated "[t]he

provisions of title I of [ISDA]," *i. e.*, the provisions applicable to self-determination contracts, and specified that "[e]ach provision of [ISDA] and each provision of this Contract shall be liberally construed for the benefit of the [Tribe]." *Id.*, at 51.

In separate annual funding agreements incorporated into the contract, the parties specified the amount of funds due from IHS to the Tribe each year. The funding agreements included a Scope of Work attachment that described the activities the contract required the Tribe to perform. See *id.*, at 99–102 (FY 2013 Scope of Work). The required activities included, among other things, "[m]aintain[ing] an efficient billing system . . . to maximize third party revenues" from "Medicare, [Medicaid], Private Insurance, and IHS Contract Health Services" and "[g]enerat[ing] maximum third party revenues for all eligible patient transports." *Id.*, at 101–102.

In 2019, the Tribe sued the Government for breach of contract. As relevant, the Tribe contended that although it used both the Secretarial amount and program income to operate its healthcare programs under the self-determination contract, IHS failed to pay contract support costs for the Tribe's healthcare services to the extent they were funded by program income. *Id.*, at 10–11. The Tribe sought roughly $3 million in unpaid contract support costs for the three-year contract. *Id.*, at 16–17.

The District Court dismissed the Tribe's claim, observing that ISDA's contract support cost provisions in Section 5325(a) do not mention third-party revenue. *San Carlos Apache Tribe* v. *Azar*, 482 F. Supp. 3d 932, 934–935 (Ariz. 2020). The Ninth Circuit reversed and remanded. 53 F. 4th 1236, 1245 (2022). It reasoned that the Tribe's self-determination contract incorporated ISDA, which required the Tribe to spend third-party program income on healthcare. *Id.*, at 1241–1242. Those portions of the Tribe's healthcare programs funded by third-party income thus constituted "activities which must be carried on by [the Tribe]

as a contractor to ensure compliance with the terms of the contract," § 5325(a)(2), and the contract support costs associated with those activities were incurred "in connection with the operation of the Federal program," § 5325(a)(3)(A)(ii). *Id.*, at 1241–1242. The text of ISDA, the Court reasoned, therefore indicated that IHS was required to reimburse the Tribe for those costs. *Id.*, at 1243.

The Ninth Circuit stated that, at the very least, it could not "conclude that § 5325(a) unambiguously excludes [the] third-party-revenue-funded portions of the Tribe's health-care program from [contract-support-cost] reimbursement." *Ibid.* (emphasis deleted). The Court was also unable to conclude that Section 5326 "unambiguously" meant that spending of third-party insurance receipts was not "directly attributable" to the Tribe's self-determination contract. *Id.*, at 1244. Based on these ambiguities, the Ninth Circuit applied the Indian canon and construed the statute in the Tribe's favor. *Id.*, at 1244–1245.

B

The Northern Arapaho Tribe resides on the Wind River Reservation, which covers more than 2.2 million acres in west central Wyoming. In 2016, the Tribe entered into a self-determination contract with IHS to assume control of the reservation's health division, the Wind River Family and Community Health Care System. App. 124. In accordance with the model agreement, the contract incorporated ISDA's Title I provisions and stated that each provision of ISDA and of the contract must be "liberally construed for the benefit of the [Tribe]." *Ibid.*

Like the San Carlos Apache Tribe's contract, the Northern Arapaho Tribe's contract also incorporated an annual funding agreement and a Scope of Work attachment. Among other things, the Scope of Work specified that the Tribe would employ experienced individuals, such as "third-party claims specialists," in a financial office; bill and collect "[i]nsurance and [t]hird-[p]arty receivables"; "maintain accredita-

tion standards in order to qualify for funds through third party-payers"; secure "Medicare and Medicaid numbers for billing purposes"; meet requirements for "periodic renewal of accreditation or certification" to "maintain eligibility for these funds"; use IHS's third-party billing system for one year to give the "Tribe time to set up its own functioning . . . third-party billing system"; and conduct "[q]uality assurance and all third-party billing processes." *Id.*, at 184–186.

In 2021, the Tribe sued the Government for damages and declaratory relief. As relevant, the Tribe alleged that, pursuant to the contract's requirements, it had collected third-party revenues and spent them to provide healthcare services, yet IHS had paid no contract support costs for services funded by such program income. The Tribe averred that it spent all of its program income on activities enumerated in the Scope of Work, so the income was spent as "part of the Federal program carried out by the Tribe" under the contract. *Id.*, at 110–111. The Tribe thus contended that Section 5325(a)(3)(A) required payment of contract support costs related to the spending of those funds. It sought approximately $1.5 million in damages for the two-year period at issue. *Id.*, at 116–117.

The District Court dismissed the complaint. *Northern Arapaho Tribe* v. *Cochran*, 548 F. Supp. 3d 1134, 1143 (Wyo. 2021). A divided panel of the Tenth Circuit reversed, with each of the three judges writing separately. 61 F. 4th 810 (2023). Judge Moritz voted to reverse because "the relevant statutory provisions are ambiguous, and the Indian canon of statutory construction resolves the ambiguity in the Tribe's favor." *Id.*, at 812. Judge Eid also voted to reverse, but in her view the statute unambiguously supported the Tribe's interpretation. *Id.*, at 823–828 (opinion concurring in judgment). Judge Baldock dissented in part. *Id.*, at 828–830. Although he also viewed the Tribe's contract support costs as reimbursable under Section 5325(a), he would nonetheless

have affirmed the District Court based on the "superseding provision" of Section 5326.   *Id.*, at 828–829.

We granted certiorari in both cases.   601 U. S. —— (2023).

## III

It is undisputed that IHS must pay the Tribes the Secretarial amount and the contract support costs associated with spending that amount to operate the healthcare programs they assumed from IHS.  It is also undisputed that the Tribes' contracts require them to collect program income and that IHS must cover the cost of collecting that income.   See Brief for Petitioners 21, 38.   The only question is whether IHS must also cover the contract support costs the Tribes incur when they spend program income on the healthcare programs.

## A

The ISDA provisions that govern the amount IHS must pay as contract support costs under a self-determination contract are Sections 5325(a)(2) and (a)(3)(A).   Both provisions peg the amount to the requirements of the contract.  Because a self-determination contract requires a tribe to spend program income to further the programs transferred to it in the contract, these provisions require IHS to pay contract support costs when a tribe does so, just as IHS must pay contract support costs to support a tribe's spending of the Secretarial amount.

Section 5325(a)(2) defines contract support costs as "consist[ing]" of "the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract."[1]   The

_____

[1] Section 5325(a)(2) further specifies that contract support costs are for activities which "(A) normally are not carried on by [IHS] in [its] direct operation of the program; or (B) are provided by [IHS] in support of the contracted program from resources other than those under contract."   It is undisputed in these cases that the Tribes are seeking contract support costs for activities that satisfy Sections 5325(a)(2)(A) and (B).   Brief for Northern Arapaho Tribe 33.

touchstone for determining which "activities" must receive contract support costs is therefore "the terms of the contract." It follows that if a tribe must collect and spend program income to ensure compliance with its contract, then the reasonable administrative and overhead costs it incurs in doing so are "contract support costs" under Section 5325(a)(2).

The Tribes' contracts and ISDA plainly require them to collect program income and spend it to comply with their contracts. Each self-determination contract entered into under ISDA must contain the provisions of the "model agreement" set forth in Section 5329(c). § 5329(a)(1). The model agreement incorporates into the contract "[t]he provisions of title I of [ISDA]." § 5329(c) (model agreement § 1(a)(1)). Title I of ISDA includes Section 5325(m)(1), which requires tribes to use "program income earned . . . in the course of carrying out a self-determination contract" to "further the general purposes of the contract."

The "purposes" of the contract are no mystery. The model agreement requires that each self-determination contract include a "purpose" clause listing the "functions, services, activities, and programs" to be transferred from IHS to the tribe. See § 5329(c) (model agreement § 1(a)(2)). Tribes are thus contractually required to use program income to further the functions, services, activities, and programs transferred to them in their contracts. When they do so and incur reasonable costs for required support services, those costs are "contract support costs" under Section 5325(a)(2).

In addition to satisfying the definition set forth in Section 5325(a)(2), those costs are also "eligible costs for the purposes of receiving funding" under Section 5325(a)(3)(A). That provision specifies two types of "reasonable and allowable costs" that may be reimbursed. First, "direct program expenses for the operation of the Federal program that is the subject of the contract" are covered. § 5325(a)(3)(A)(i).

"Direct" contract support costs include the support expenses of particular programs, such as workers' compensation insurance for ambulance drivers or training for emergency room nurses. See §5304(c). Second, "any additional administrative or other expense incurred by the governing body of the [tribe] and any overhead expense incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract" are also eligible for funding. §5325(a)(3)(A)(ii). Such "indirect" contract support costs encompass expenses that benefit multiple programs, such as auditing infrastructure, personnel systems, and legal services. See §5304(f).

Direct contract support costs incurred when using program income are covered because the functions, services, activities, and programs that a tribe agrees to administer in IHS's stead under a self-determination contract constitute the "Federal program that is the subject of the contract." When IHS administers the Federal program for the tribe's members, it uses congressional appropriations and third-party insurance payments to do so. See 25 U. S. C. §§13, 1621e(a); 42 U. S. C. §§1395qq(a), 1396j(a). IHS must use the third-party collections to provide healthcare services. See 25 U. S. C. §§1621f(a)(1), 1641(c)(1)(B). So IHS's Federal program comprises congressionally funded *and* third-party funded healthcare. When that program is transferred to the tribe from IHS, the tribe, rather than IHS, becomes the entity collecting program income and spending it on the Federal program. The tribe's resultant direct contract support costs are incurred "for the operation of the Federal program that is the subject of the contract." Those costs are thus eligible to receive funding under Section 5325(a)(3)(A)(i).

Indirect contract support costs that result from spending program income must be covered by IHS for the same reason. A tribe's self-determination contract requires it to

spend program income on furthering the Federal programs, functions, services, or activities it assumes from IHS. §§ 5325(m)(1), 5329(c). When the tribe does so—as IHS did when it operated the program, function, service, or activity—and incurs administrative and overhead expenses, those expenses are incurred "in connection with the operation of the Federal program, function, service, or activity pursuant to the contract." Such expenses are thus eligible for reimbursement under Section 5325(a)(3)(A)(ii).

The self-determination contracts of the San Carlos Apache Tribe and the Northern Arapaho Tribe go to some length to require them to collect program income by maintaining third-party billing systems and generating maximum third-party revenues. See App. 101–102, 184–186. Once the Tribes collect third-party income, they must use it. §§ 5325(m)(1), 5329(c). The Tribes aver that they have collected and spent program income as required by their contracts to carry out the operations IHS transferred to them. *Id.*, at 9–11, 109–115; Brief for Northern Arapaho Tribe 29 ("Northern Arapaho is prepared to prove that every penny of program income was, in fact, spent on activities enumerated in the contractual scope of work."). The reasonable direct and indirect contract support costs they incurred as a result are eligible for repayment under Section 5325(a) because they were incurred to "ensure compliance with the terms of the contract," § 5325(a)(2), and "for the operation of" and "in connection with the operation of" the "Federal program" they assumed from IHS, § 5325(a)(3)(A).[2]

---

[2] To the extent that the Tribes spent program income on activities enumerated in their contractual Scope of Work, they spent it on the "Federal program" they expressly agreed to assume from IHS. Contract support costs incurred in connection with that spending are recoverable. § 5325(a)(3)(A). Although Section 5325(m)(1)'s requirement that the Tribes spend program income to further the "general purposes" of their self-determination contracts allows them some flexibility in their spending, we need not decide the extent of that flexibility in these cases. The only question before us now is whether the Tribes can recover contract support

B

IHS's obligation to pay contract support costs is limited by Section 5326, but the limitations of that provision do not preclude payment of costs incurred by the required spending of program income under a self-determination contract. Section 5326 requires that IHS pay contract support costs "only for costs directly attributable to contracts . . . pursuant to [ISDA]." It further provides that no funds "shall be available for any contract support costs or indirect costs associated with any contract, grant, cooperative agreement, self-governance compact, or funding agreement entered into between [a tribe] and any entity other than [IHS]." §5326.

When a tribe spends program income to further the healthcare programs it assumes from IHS and incurs contract support costs, the costs it incurs are "directly attributable" to the self-determination contract. Contrary to the Government's assertion, there is no extended chain of causation: The Tribes' self-determination contracts require the collection of program income. See *supra*, at 230, 231–232. The self-determination contracts then require the expenditure of program income. And the self-determination contracts govern the activities on which that income may be spent. The required contract support costs that result are "directly attributable" to the binding terms of the contract.

Nor are such costs "associated with" any contract between a tribe and a third party. Those costs are instead associated with the contract referred to in the phrase "*contract* support costs." In other words, the costs are "associated with" the "contract" that requires the work that generates the costs— the self-determination contract.

A tribe's contracts with third-party payers are quite different. A Medicare or Medicaid provider agreement, for example, does not generate contract support costs by

_____

costs at all when they collect and spend program income pursuant to their contracts.

specifying which healthcare services a tribe must provide; rather, it simply serves as a predicate for the tribe to collect program income after it has already rendered services to a tribal member who is a Medicare or Medicaid beneficiary. And when a tribe bills a private insurance company for services rendered to an insured tribal member, the tribe might have no pre-existing and ongoing agreement with the insurance company at all.

The history of Section 5326 confirms this analysis. Congress enacted this provision in 1998 after the Tenth Circuit's decision in *Ramah Navajo Chapter* v. *Lujan,* 112 F. 3d 1455 (1997). *Ramah* involved a Tribe that had self-determination contracts with the Bureau of Indian Affairs (BIA) for various programs, including law enforcement, and separate contracts with the State of New Mexico for criminal justice and juvenile offender restitution programs. *Id.,* at 1458–1459. The Tenth Circuit held that the BIA was required to pay the Tribe's full indirect contract support costs—not only for the programs administered under the BIA contracts, but also for those administered under the state contracts. *Id.,* at 1462–1463. The Government and the Tribes agree that Congress added Section 5326 to override *Ramah* and clarify that IHS may not pay costs incurred to support non-ISDA contracts. See Brief for Petitioners 8; Brief for Northern Arapaho Tribe 46; Brief for San Carlos Apache Tribe 12–14.

The direct attribution and association problems present in *Ramah* are not implicated here. In *Ramah,* the state contracts, not the BIA contracts, required the activities that resulted in the contract support costs for the criminal justice and juvenile offender restitution programs. Although those costs might have had an attenuated relation to the programs operated under the BIA contracts, they were "directly attributable" to and "associated with" the state contracts, not the BIA self-determination contracts. Here, the self-determination contract itself requires tribes to spend program income to further healthcare programming. The

contract support costs tribes incur when they do so are re-coverable under Sections 5325(a) and 5326.

IV

A

The Government's arguments to the contrary find no sup-port in ISDA's text.  The Government begins with the premise that Section 5325(a)(2)'s requirement to pay contract support costs is "tied to" Section 5325(a)(1)'s Secretarial amount.  Brief for Petitioners 21.  But nothing in Section 5325(a)(2) suggests that contract support costs are *limited* to programs funded by the Secretarial amount.   In fact, Sec-tion 5325(a)(2) defines contract support costs as tied to "the terms of the contract," which require tribes to fund pro-grams with program income.   See §§ 5325(m)(1), 5329(c).

The Government then attempts to extend its flawed prem-ise to Section 5325(a)(3)(A), asserting that the contract sup-port costs of spending program income are ineligible for repayment under that provision because the "Federal pro-gram" comprises only the Secretarial amount.  *Id.*, at 22.  But besides reciting Section 5325(a)(3)(A), the Government cites no statutory text to support this assertion.  *Ibid.*  And Section 5325(a)(3)(A) refers to eligible costs for the op-eration of the "Federal program" without limiting that pro-gram to the Secretarial amount.

B

Leaving the text behind, the Government argues that the tribes should not get contract support costs for spending pro-gram income because that would give them the flexibility to spend such income on a broader range of activities than IHS can.  *Id.*, at 29.  But none of the Government's cited differ-ences withstand scrutiny.

First, the Government says that IHS cannot offer health-care services to non-Indians unless the beneficiary tribe requests it, whereas a tribe running its own programs can

unilaterally decide to offer such services. *Ibid.* This difference is irrelevant. Before either IHS or a contracting tribe may offer healthcare services to non-Indians, both must make the same determination: Whether such services will result in a denial or diminution of services to eligible Indians. §§ 1680c(c)(1)(B), (c)(2). And the fact that the contracting tribe can act unilaterally in this regard is the natural result of self-determination.

Next, the Government says that when IHS collects Medicare and Medicaid proceeds, it must "first" use such proceeds to ensure compliance with those programs. *Id.*, at 29 (quoting § 1641(c)(1)(B)). But tribes also have to ensure compliance with Medicare and Medicaid requirements using program income. § 1641(d)(2)(A).

Finally, the Government contends that while Congress has prohibited IHS from using Medicare and Medicaid proceeds to construct new facilities, tribes do not face this prohibition and thereby have greater ability to expand their operations. *Id.*, at 30. But to the extent that a tribe expands its programs beyond the "Federal program," IHS would not have to pay contract support costs for the tribe's new programs.

Even if there are minor differences between what IHS and tribes can do with program income, that should not be surprising given ISDA's design to provide tribes greater flexibility in planning and implementing healthcare programs attuned to the needs of their communities. See § 5302(a). The Government points to nothing in ISDA's text to suggest that those differences excuse IHS from paying contract support costs when tribes spend program income on the programs they have assumed from IHS.

C

As for the dissent, its central assertion is that the support costs tribes incur when they spend program income are not incurred in the "performance of their contracts." *Post*, at

248 (opinion of KAVANAUGH, J.).  But the Tribes' contracts plainly require them to collect income from third-party insurers.  See *supra*, at 230, 231–232.  And by incorporating Section 5325(m)(1), see §§ 5329(a)(1), (c), self-determination contracts plainly require tribes to use that income "to further the general purposes of the[ir] contract[s]."  The dissent complains that "the contracts do not address how the tribes must spend their third-party income."  *Post*, at 250.  But as we have explained, the "purpose" clause of each contract describes the programs which tribes must further using program income.  See *supra*, at 234.  The support costs tribes incur when they do so are incurred in the "performance of their contracts" to "ensure compliance with the terms of the[ir] contract[s]."  *Post*, at 248; § 5325(a)(2).  And those costs are "directly attributable" to and "associated with" tribes' self-determination contracts.  See *supra*, at 237.  Obfuscating this straightforward reading of the relevant ISDA provisions, the dissent points to Section 5388(j) and the costliness of ISDA's mandates.  But Section 5388(j) does not apply to self-determination contracts, and complaints about costs are the domain of Congress, not this Court.

V

Aside from being inconsistent with the statute's text, IHS's failure to cover contract support costs for healthcare funded by program income inflicts a penalty on tribes for opting in favor of greater self-determination.  Congress designed the statute to avoid such a counterproductive result.

Underlying ISDA was a congressional finding that federal domination of Indian service programs had denied tribes an effective voice in the planning and implementation of programs responsive to the true needs of their communities.  See § 5301(a)(1).  Congress thus designed ISDA to promote "maximum Indian participation" in the administration of healthcare programs.  § 5302(a).  To that end, Congress's

consistent directive to IHS is to place contracting tribes in the same financial position as IHS, so that tribes do not face a self-determination penalty when they take control of their own healthcare.

When tribes enter into self-determination contracts and assume control of IHS's programs, they receive the same amount of congressionally appropriated funds to run the programs as IHS would have. See § 5325(a)(1). Congress also allows tribes, like IHS, to fund the programs with income from third-party payers. See 42 U. S. C. §§ 1395qq(a), 1396j(a); 25 U. S. C. § 1621e(a). To be clear, IHS needs to collect these funds just to cover its obligations to tribal members. Indeed, 60 percent or more of the yearly budget of some IHS healthcare facilities relies on third-party revenues. Dept. of Health and Human Servs., Fiscal Year 2024, IHS, at CJ–193; see also IHS, Indian Health Manual § 5–1.1(B) (2024) ("[T]hird-party billing and collections have become critical activities for the IHS. . . . Safeguarding this revenue stream and related assets is vital to IHS health care programs."). Like IHS, tribes choosing self-determination in healthcare need to collect and spend program income if they are to maintain the same level of services they received from IHS. For that reason, Congress specifically instructed IHS that program income "shall not be a basis for reducing" a tribe's Secretarial amount. § 5325(m)(2).

Contract support costs are necessary to prevent a funding gap between tribes and IHS. By definition, these are costs that IHS does not incur when it provides healthcare services funded by congressional appropriations and third-party income. §§ 5325(a)(2)(A) and (B). But they are costs that tribes must bear when they provide, on their own, healthcare services funded by the Secretarial amount and program income. If IHS does not cover costs to support a tribe's expenditure of program income, the tribe would have to divert some program income to pay such costs, or it would have to pay them out of its own pocket. Either way, the tribe would

face a systemic funding shortfall relative to IHS—a penalty
for pursuing self-determination.

*    *    *

The self-determination contracts of the San Carlos Apache
Tribe and Northern Arapaho Tribe require them to collect
and spend program income to further the functions, services,
activities, and programs transferred to them from IHS.
When the Tribes do so and incur administrative costs, ISDA
requires IHS to pay those support costs.

The judgments of the Courts of Appeals for the Ninth and
Tenth Circuits are

*Affirmed.*

JUSTICE KAVANAUGH, with whom JUSTICE THOMAS, JUS-
TICE ALITO, and JUSTICE BARRETT join, dissenting.

The Indian Self-Determination Act allows Indian tribes to
assume control of healthcare programs that the Federal Gov-
ernment would otherwise administer on a tribe's behalf.
When a tribe assumes control of a healthcare program, the
statute entitles the tribe to federal funding for the costs of
running the program, as well as additional federal funding
for associated administrative costs.

A separate federal law—the Indian Health Care Improve-
ment Act—authorizes tribes that assume control of health-
care programs to collect third-party payments from Medi-
care, Medicaid, and private insurers for the services that
the tribes provide to patients. The tribes may spend that
third-party income for any healthcare-related purpose—for
example, building new healthcare facilities. But spending
the third-party income requires additional expenditures on
overhead.

Consider a tribe that assumes control of a healthcare pro-
gram and receives federal funding pursuant to the Self-
Determination Act. For its services to patients, the tribe
also collects an additional $1 million from Medicare and

Medicaid pursuant to the Improvement Act. In order to spend that $1 million on healthcare, the tribe must incur some amount of overhead costs—let's say $100,000. Who pays that $100,000? Must the Federal Government pay it by giving the tribe another $100,000 in federal funding? Or does the tribe pay the $100,000 out of the $1 million in third-party income that it collected?

That is the question in this case. For the past 30 years, the Executive Branch has interpreted the relevant statutory provisions, 25 U. S. C. §§ 5325–5326, to require tribes to pay those overhead costs out of the third-party income collected from Medicare, Medicaid, and private insurers. And Congress has never overturned that consistent Executive Branch practice.

But today, the Court upends that long-settled understanding and requires the Federal Government to furnish additional funding to the tribes for the costs of spending the third-party income. I respectfully dissent.

As I see it, the relevant statutory provisions do not support the Court's decision. And the extra federal money that the Court today green-lights does not come free. The Federal Government estimates that adopting the tribes' position could cost between $800 million and $2 billion annually (and potentially many billions more in retroactive payments). Yet as of now, Congress appropriates about $8 billion annually for Indian healthcare. So if Congress does not change the overall annual appropriations for Indian healthcare, the Court's decision will divert funding from poorer tribes to richer tribes. (There are 574 federally recognized tribes.) That is because poorer tribes are less likely to administer their own healthcare programs and therefore do not receive third-party income from Medicare, Medicaid, and private insurers. Alternatively, the Court's decision will require Congress to substantially increase its overall annual appropriations for Indian healthcare, thereby drawing money away

KAVANAUGH, J., dissenting

from other vital federal programs or requiring additional taxes.

In my view, the Court should leave those difficult appropriations decisions and tradeoffs to Congress and the President in the legislative process, and not now upset the settled legal understanding that has prevailed for the last 30 years.

I

The baseline provider of healthcare to American Indians is the Indian Health Service—a Federal Government agency. The Indian Health Service runs hospitals and other healthcare programs that serve tribal members.

To facilitate tribal self-determination and self-governance, the Indian Self-Determination Act allows tribes to assume control of the healthcare programs that the Indian Health Service would otherwise operate on the tribes' behalf. See 88 Stat. 2206, as amended, 25 U. S. C. §§ 5321–5332. To assume control of a healthcare program, a tribe enters into a "self-determination contract" that identifies both the healthcare program that the tribe will administer and the funding that the Indian Health Service will give to the tribe. § 5321(a)(1); see § 5329(c).

Under the Act, the federal funding authorized in each self-determination contract contains two main components: (i) a secretarial amount and (ii) contract support funding. The secretarial amount consists of the funds that the Indian Health Service would have spent on the contracted programs in the absence of the self-determination contract. § 5325(a)(1). And contract support funding covers the additional costs of certain activities that a tribe "must" carry on "to ensure compliance with the terms of" its "contract." § 5325(a)(2).

The contract support funding fills recognized gaps in secretarial funding. When a tribe assumes control of a healthcare program and provides the associated healthcare serv-

ices, the tribe will sometimes incur costs that the Indian Health Service would not have incurred, such as the costs of contributing to state workers' compensation programs for the healthcare workers, as well as extra administrative costs.

The Federal Government does not fund those costs through the secretarial amount, which covers only what the federal agency would otherwise have spent on the tribe's individual healthcare program. See § 5325(a)(1). So contract support funding bridges the gap, covering the workers' compensation and administrative costs that the tribe must expend to comply with its self-determination contract. See *Cherokee Nation of Okla.* v. *Leavitt*, 543 U. S. 631, 635 (2005). By supplementing the secretarial amount in that way, contract support funding assists tribes in providing the same level of care as the Federal Government's healthcare programs.

A separate federal statute—the Indian Health Care Improvement Act—authorizes tribes that operate their own healthcare programs to collect and spend payments they receive from Medicare, Medicaid, and private insurers for providing services to patients. See §§ 1621e(a), 1641(d)(1); 42 U. S. C. §§ 1395qq(a), 1396j(a). By law, the tribe possesses significant flexibility in how to then spend that third-party income. Specifically, the tribe may use its Medicare and Medicaid income for "any health care-related purpose." 25 U. S. C. § 1641(d)(2)(A).

In this case, the San Carlos Apache Tribe and the Northern Arapaho Tribe entered self-determination contracts to assume control of healthcare programs that benefit their tribal members. Each tribe therefore receives both a secretarial amount and contract support funding from the Federal Government. The tribes use that funding to provide healthcare services specified in their contracts, including emergency medical services, outpatient primary care, and dentistry.

In addition to that federal funding, the two tribes collect third-party payments from Medicare, Medicaid, and private insurers. The tribes then spend that third-party income for additional healthcare purposes, such as improvements to tribal healthcare facilities. For example, the Northern Arapaho Tribe spent some of its recent third-party income on "facility construction." Tr. of Oral Arg. 78. And the San Carlos Apache Tribe might spend its third-party income on construction projects such as "building a garage to house the ambulances" for an EMS program. *Id.*, at 87.

## II

The tribes' basic theory is that the federal funding authorized by the Self-Determination Act for running the healthcare programs specified in the tribes' contracts may be stretched to also cover the costs associated with the tribes' spending of the third-party income that they collect under the Improvement Act. The tribes do not argue that the Improvement Act itself authorizes funding to cover those costs. Instead, they argue that the Self-Determination Act does so.

In assessing the tribes' Self-Determination Act argument, two provisions of that Act are key. The first is 25 U. S. C. § 5325, which authorizes federal funding for tribes that administer their own healthcare programs. The second is § 5326, which places important constraints on that federal funding.

Section 5325 begins by authorizing the secretarial amount. Recall that § 5325(a)(1) entitles each tribe that administers its own healthcare program to the federal funding that the Indian Health Service would have otherwise spent on the "program" covered by that tribe's self-determination "contract." § 5325(a)(1).

And § 5325(a)(2) then entitles each tribe to contract support funding. That contract support funding covers only those costs, such as administrative costs, that the tribe

"must" incur to provide the healthcare "program" specified by the "contract." § 5325(a)(2).[1]

Section 5326 then imposes two important limitations on contract support funding. First, § 5326 confines contract support funding to costs that are "directly attributable" to, as relevant here, self-determination contracts. Second, § 5326 prohibits contract support funding that is "associated with any contract" between a tribe and "any entity other than the Indian Health Service." Those two limitations apply "notwithstanding any other provision of law." § 5326.[2]

The tribes argue that the Federal Government must provide contract support funding to cover the tribes' costs of spending their third-party income from Medicare, Medicaid, and private insurers. But the Federal Government disagrees. As the Federal Government sees things, contract support funding supports only the tribes' performance of their contracts. So contract support funding provided pursuant to the Self-Determination Act cannot be stretched to cover the entirely separate tribal costs associated with

---

[1] The full text of § 5325(a)(2) states: "There shall be added to the amount required by [§ 5325(a)(1)] contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—(A) normally are not carried on by the [Indian Health Service in] direct operation of the program; or (B) are provided by the [Indian Health Service] in support of the contracted program from resources other than those under contract."

[2] The full text of § 5326 states: "Before, on, and after October 21, 1998, and notwithstanding any other provision of law, funds available to the Indian Health Service in this Act or any other Act for Indian self-determination or self-governance contract or grant support costs may be expended only for costs directly attributable to contracts, grants and compacts pursuant to the Indian Self-Determination Act [25 U. S. C. 5321 et seq.] and no funds appropriated by this or any other Act shall be available for any contract support costs or indirect costs associated with any contract, grant, cooperative agreement, self-governance compact, or funding agreement entered into between an Indian tribe or tribal organization and any entity other than the Indian Health Service."

spending their third-party income from Medicare and Medicaid pursuant to the Improvement Act.

For five reasons, I agree with the Federal Government.

*First*, the statutory authorization for contract support funding in § 5325(a)(2) of the Self-Determination Act does not even mention the third-party income that tribes collect pursuant to the Improvement Act from Medicare, Medicaid, and private insurance companies. If Congress intended § 5325(a)(2) to supply federal funding for the overhead costs incurred in spending that third-party income, Congress surely would have said so in the Improvement Act, the Self-Determination Act, or other statutory text. That is particularly so given the relatively large amount of additional appropriations that would be necessary (up to $800 million to $2 billion per year, according to the Federal Government). Congress does not usually employ subtle indirection to dish out such significant pots of federal money to agency programs. And if the Executive Branch for three decades had somehow misunderstood Congress's instructions, Congress could have amended the statute. It did not.

*Second*, § 5325(a)(2) authorizes contract support funding only for the activities that a tribe "must" perform to comply with its self-determination "contract" and support its "contracted program." That provision authorizes contract support funding for the administrative costs of spending a tribe's secretarial amount on the healthcare programs specified in the tribe's self-determination contract. Contract support funding therefore bridges the gap between the secretarial funds that the Federal Government would have spent on a healthcare program and what the tribe "must" spend to obtain the same benefit from those secretarial funds. § 5325(a)(2); see *supra*, at 245.

But all agree that, for example, § 5325(a)(2) does not authorize contract support funding for the costs of spending the money in the tribe's general treasury—money that the tribe receives independently of its contract and that the tribe

may spend for any lawful purpose. In the same way, §5325(a)(2) does not authorize contract support funding for the costs of spending the tribe's Medicare and Medicaid payments—payments that the tribe receives from transactions outside of its healthcare contract (pursuant to the Improvement Act) and that the tribe may spend on "any health care-related purpose." §1641(d)(2)(A). The costs of spending the tribe's Medicare and Medicaid income therefore resemble the costs of spending money from the tribe's general treasury. And neither category of costs is necessary to support the tribe's "contract" and "contracted program"—the statutorily imposed conditions for obtaining additional contract support funding. §5325(a)(2).[3]

*Third*, turning to §5326, that provision independently restricts contract support funding to the costs that are "directly attributable" to tribes' self-determination contracts. The costs of spending the Medicare and Medicaid income are not directly attributable to the contracts in this case. After all, the contracts do not address how the tribes must spend their third-party income. Moreover, the Improvement Act allows tribes to spend their Medicare and Medicaid income on "any health care-related purpose," §1641(d)(2)(A), not just to support contractual activities specified by the self-determination contracts. And tribes have made use of that flexibility to spend their third-party income on healthcare services and construction projects that fall outside of their individual contracts. For example, the Northern Arapaho Tribe spent some of its recent third-party income on facility

---

[3] The costs of spending payments from *private insurers* are similarly detached from the costs needed to support a tribe's "contract" and "contracted program." §5325(a)(2). Tribes collect insurance payments pursuant to the Improvement Act, which governs the "reasonable charges" that a tribe may bill to private insurers. §1621e(a). And after the tribe obtains its insurance payments, the tribe may spend them to advance the "general purposes" of its healthcare contract, §5325(m)(1)—a broad authorization that mirrors the tribe's ability to spend its Medicare and Medicaid payments on "any health care-related purpose," §1641(d)(2)(A).

construction, even though the tribe's contract does not authorize facility construction. See Tr. of Oral Arg. 78. Because tribes may spend third-party income on programs that are never mentioned in their self-determination contracts, the costs of spending that income are not "directly attributable" to those contracts. §5326.

*Fourth*, §5326 separately precludes contract support funding that is "associated with any contract" between a tribe and an "entity other than the Indian Health Service." To obtain Medicare and Medicaid payments, the tribes enter into contracts with the Secretary of Health and Human Services for Medicare and with state agencies for Medicaid. See 42 U. S. C. §§1395cc, 1395qq, 1396a(a)(27), 1396j; see also Brief for Petitioners 27 ("To receive Medicare and Medicaid reimbursements, tribal providers enter into agreements with Medicare and Medicaid authorities"). Those contracts are plainly contracts between tribes and entities "other than" the Indian Health Service. 25 U. S. C. §5326. And the tribes' requested funding is clearly "associated with" the money that the tribes receive as a result of those contracts. *Ibid.* It follows that tribes may not obtain contract support funding to cover the costs of spending their Medicare and Medicaid income. *Ibid.*

*Fifth*, another statutory provision in the Self-Determination Act underscores the separation between (i) the federal funding that tribes receive due to their self-determination contracts and (ii) the third-party income that tribes collect from Medicare, Medicaid, and private insurers. Section 5388(j) states that all third-party income "earned by an Indian tribe shall be treated as supplemental funding" to the funding available through the tribe's self-determination contract. Because the tribe's third-party income is "supplemental," the costs of spending that income are legally separate from the costs of supporting the contract. For that reason too, contract support funding cannot encompass the costs of spending third-party income. See *Fort McDermitt Pai-*

*ute and Shoshone Tribe* v. *Becerra*, 6 F. 4th 6, 14 (CADC 2021).[4]

In my view, each of those five arguments individually casts substantial doubt on the Court's conclusion today. And the five arguments taken together convincingly show that the Court's conclusion is mistaken. The bottom line is that § 5325 does not authorize and, in any event, §§ 5326 and 5388(j) prohibit the Federal Government from covering the tribes' costs of spending their third-party income. That straightforward reading of the Self-Determination Act is why, for the last 30 years, the Executive Branch has interpreted the statute not to authorize funding to the tribes for the costs of spending third-party income.

## III

To reach the contrary conclusion, the Court creates a requirement that is absent from both the statute and the contracts in this case—that tribes must spend all of their third-party income received from Medicare and Medicaid on the "programs transferred to them in their" self-determination contracts. *Ante*, at 234. By doing so, the Court creatively attempts to morph (i) the costs that a tribe incurs in spending that third-party income into (ii) the category of costs that a tribe must incur to "ensure compliance with" its "contract." § 5325(a)(2).

The Court's effort to recharacterize the costs of spending third-party income as contract support costs does not work.

---

[4] Section 5388(j) appears in Title V of the Self-Determination Act, which governs self-governance compacts as opposed to self-determination contracts. See Cohen's Handbook of Federal Indian Law § 22.02[3], p. 1389 (2012) (compacts give "additional flexibility in program administration"). But the Self-Determination Act requires the Government to fund both compacts and contracts pursuant to the definitions of the secretarial amount and contract support funding in § 5325. See §§ 5325(a), 5388(c). And because § 5388(j) makes clear that third-party income is separate from the contract support funding for self-governance compacts, the same is true regarding the contract support funding for self-determination contracts.

The Improvement Act authorizes tribes to spend (and the tribes do spend) their Medicare and Medicaid income on "any health care-related purpose." §1641(d)(2)(A). And the broad phrase "any health care-related purpose" encompasses activities that are *not* covered in tribes' contracts, including "improvements in health care facilities." *Ibid.* Indeed, at oral argument, the tribes in this case forthrightly acknowledged that they may use third-party income to cover the costs of constructing new healthcare facilities, even though their contracts do not authorize construction. See Tr. of Oral Arg. 78, 87–88. That acknowledgment was sensible, as the phrase "any health care-related purpose" clearly expands the potential uses of Medicare and Medicaid income beyond the purposes of a single contract. And that acknowledgment completely undermines the basis for the Court's decision today.[5]

If Congress wanted to limit the tribes' spending of their third-party income to supporting the programs in tribes' self-determination contracts—and thereby wanted to cover the tribes' overhead costs of spending that third-party income—several provisions in the statute illustrate how Congress could have done so. See, *e.g.,* §5325(a)(4)(A) (requiring that tribes use savings for "additional services or benefits under the contract"). For example, the Self-Determination Act contains a model contract, and Congress might have used that contract to set forth specific requirements regarding tribes' use of third-party income. See §5329(c). But Congress did not do so.

Congress had good reasons for granting tribes flexibility over the spending of their third-party income, and not limiting that spending to support of the contract. Among other things, that flexibility flows from the policy of self-

_____

[5] Indeed, it is not clear that all Indian tribes want to win on the ground that the Court relies on today. Going forward from the Court's opinion today, as I understand it, the tribes may face greater restrictions on the spending of their third-party income than they have previously faced.

determination that runs throughout the statute.   See § 5302.
For present purposes, however, one byproduct of that flexi-
bility is that the overhead costs of spending third-party
income are untethered from the "program" in a self-
determination "contract."   § 5325(a)(2).   Likewise, those
costs are not "directly attributable" to a self-determination
contract.   § 5326.   As explained above, it follows that the
Federal Government is not authorized to reimburse tribes
for those costs.

In an attempt to avoid that straightforward conclusion, the
tribes in this case (echoed by the Court) represent that, at
least recently, they have *voluntarily* spent their third-party
income only on their contracted programs.   But a few tribes'
voluntary choices not to spend third-party income as freely
as the Improvement Act allows does not solve their statutory
problem—which is that contract support funding by law does
not extend to funding for the costs associated with spending
third-party income.

Nor can the Court glide over those difficulties by invoking
what it calls a "self-determination penalty."   *Ante*, at 242.
The Court writes that failing to fund the costs of spending
third-party income would penalize tribes for pursuing self-
government, on the theory that tribes would then need to
pay those costs using their third-party income.   See *ante*, at
242–243.   But the fact that a tribe must pay, for example,
$100,000 in overhead out of the $1 million in third-party in-
come that it receives does not warrant the label "self-
determination penalty."

Even within the narrow context of spending Medicare and
Medicaid income, moreover, there is no self-determination
penalty.   The tribes can spend third-party income with
much greater flexibility than the Federal Government can.
Compare, *e.g.*, § 1641(c)(1)(B) (the Government must "first"
spend that income on compliance with Medicare and Medic-
aid requirements), with § 1641(d)(2)(A) (tribes may spend
their third-party income on "any health care-related pur-

pose"). For example, the tribes can use their Medicare and Medicaid income to construct new healthcare facilities, whereas Congress has prohibited the Indian Health Service from using Medicare and Medicaid funds for that same purpose. See Reply Brief 11.

In short, the rather loaded term "self-determination penalty" is not an accurate or appropriate way to describe how the Executive Branch has construed the statute for the last 30 years. And if there were really such a penalty (there is not), then the solution lies with Congress, not by judicially rewriting Congress's funding laws.

The tribes raise a separate policy concern that tribal hospitals are underfunded and that the Federal Government does not reimburse them for the true costs of tribal healthcare. They may or may not be right about that. But those arguments boil down to disagreeing with the appropriations amount that Congress has provided for Indian healthcare. Appropriations decisions often require painful tradeoffs. But a court may not depart from the best reading of a statute simply because a party disagrees with Congress's appropriations decisions for one program.

That basic separation of powers principle carries particular force when, as here, distorting Congress's appropriations decisions will have significant ripple effects. To reiterate, according to the Federal Government, if it must fund the costs of the tribes' spending of their third-party income, that could require an estimated $800 million to $2 billion annually in additional federal expenditures. See Brief for Petitioners 44. If the overall annual appropriations amount for Indian healthcare stays the same, today's decision will divert funding from poorer tribes to richer tribes (again, because poorer tribes generally do not administer their own healthcare programs and therefore do not receive third-party income).[6]

---

[6] See Harvard Project on American Indian Economic Development, The State of the Native Nations 230 (2008) (noting that tribes must have "resources—both human and financial—to transition to tribal management"

Indeed, at oral argument, the Northern Arapaho Tribe acknowledged that, in light of "simple mathematics," a decision like the Court's today would shift money from one class of tribes to another class of tribes. Tr. of Oral Arg. 61. Alternatively, today's decision may require Congress to substantially increase its overall annual appropriations for Indian healthcare, thereby taking money away from other federal programs or imposing additional costs on taxpayers.

Rather than experimenting with reallocation of those funds, or assuming without basis that Congress will increase appropriations for Indian healthcare at the expense of other national priorities (it might; it might not), I would simply follow the statute as written.[7]

\*　　\*　　\*

In sum, federal law does not authorize funding to cover the tribes' costs of spending their third-party income. I respectfully dissent.

---

of healthcare programs); GAO, F. Rusco, Indian Programs: Interior Should Address Factors Hindering Tribal Administration of Federal Programs 11 (GAO–19–87, 2019) ("The capacity of a tribal government to administer a federal program or manage its resources is a key factor that can affect a tribe's decision to enter into a self-determination contract").

[7] Some of the lower-court litigation in this case has concerned the meaning of § 5325(a)(3)(A), which divides contract support costs into two categories: direct costs and indirect costs. Of note, the tribes in this case argued that they are entitled to contract support funding for expenses that fall within the language of § 5325(a)(3)(A), even if those expenses do not satisfy § 5325(a)(2). See Brief for San Carlos Apache Tribe 18; Brief for Northern Arapaho Tribe 30. That is incorrect. See *Cook Inlet Tribal Council, Inc.* v. *Dotomain*, 10 F. 4th 892, 895–896 (CADC 2021). The Government notes, moreover, that adopting the tribes' position on that issue would have "broad ramifications beyond the funding dispute at issue here." Reply Brief 9, n. 2. I do not read the Court's decision today to adopt the tribes' position on that issue. Instead, tribes may obtain contract support funding only for expenses that satisfy both § 5325(a)(2) and § 5325(a)(3)(A). See *ante*, at 233–236.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication
and citation style of the United States Reports. The revised pagination
makes available the official United States Reports citation in advance of
publication. The syllabus has been prepared by the Reporter of Decisions
for the convenience of the reader and constitutes no part of the opinion of
the Court. A list of counsel who argued or filed briefs in this case, and
who were members of the bar of this Court at the time this case was
argued, has been inserted following the syllabus. Other revisions may
include adjustments to formatting, captions, citation form, and any errant
punctuation. The following additional edits were made:

None